126 N.J. Super. 200 (1973)
313 A.2d 624
CAPPTURE REALTY CORPORATION, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
BOARD OF ADJUSTMENT OF THE BOROUGH OF ELMWOOD PARK, PLANNING BOARD OF THE BOROUGH OF ELMWOOD PARK, BOROUGH OF ELMWOOD PARK, A MUNICIPAL CORPORATION IN THE COUNTY OF BERGEN AND STATE OF NEW JERSEY AND MICHAEL BUCK, BUILDING INSPECTOR OF THE BOROUGH OF ELMWOOD PARK, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 21, 1973.
*202 Mr. Lucien Baron for plaintiff (Messrs. Andora, Baron, Palmisano & DeCotiis, attorneys).
Mr. Stephen R. Spector for defendant Borough of Elmwood Park (Messrs. Ferrara, Glock & Spector, attorneys).
Mr. Malcolm Blum for defendant Board of Adjustment (Messrs. Sirota, Carlton & Blum, attorneys).
*203 PETRELLA, J.C.C., Temporarily Assigned.
Plaintiff corporation in this action in lieu of prerogative writ, challenges the denial of a special exception use under Ordinance No. 71-13, as amended by Ordinance No. 72-15 of defendant Borough of Elmwood Park. These ordinances and Ordinance No. 73-14 essentially declared a moratorium on construction on certain lands in the borough within what is referred to as the flood-prone or flood-plain area of Fleischer Brook, unless a special exception use permit was obtained from the governing body on recommendation of the board of adjustment. However, the planning board must issue an advisory report approving the variance and the applicant must satisfy criteria in the ordinance. Plaintiff also challenges the requirement for a permit in an "Industrial E" zone under section 88-17 of the borough[1] zoning ordinance. Additionally, the reasonableness of the moratorium and constitutionality of the ordinances are challenged.
The court finds, based on the record in this case, that Ordinance No. 71-13 was adopted in October 1971 for a one-year period. It contained, among other things, the following statement of purpose:
WHEREAS, it is of immediate and vital importance that all construction in the flood prone and flood plain areas be prohibited for a reasonable time to enable the Borough of East Paterson to study and put into operation flood control plans and to study and adopt necessary amendments to its Zoning Ordinances and Building Code to prevent and alleviate flood conditions in such area; * * *.
The original ordinance also expressed concern for eligibility under the National Flood Insurance Act of 1968. See 42 U.S.C.A. § 4022.
Ordinance No. 72-15 was enacted in October 1972, amended sections 2 and 3 of Ordinance No. 71-13, and extended the moratorium for a second year. In November *204 1973 the 1972 ordinance was substantially reenacted as Ordinance No. 73-14 and extended for another year. Section 3 of the amendatory ordinance expressly provided that all other provisions of the original ordinance remained in full force and effect. The parties stipulated that although enactment of the 1973 ordinance was subsequent to the filing of the complaint and trial of this cause, the decision would be binding on the 1973 ordinance.
Plaintiff owns approximately 3.2 acres of vacant land in Elmwood Park traversed by Fleischer Brook. The subject property is located within 250 to 300 feet of East 54th Street, an area subject to severe flooding.
An engineering firm was retained by the county in August 1970 to study Fleischer Brook, which runs through the municipalities of Saddle Brook, Fair Lawn, Elmwood Park and Garfield. The resulting report, "Flood Control Study, Fleischer Brook," dated December 1971, was submitted in April or May of 1972 to the board of chosen freeholders and the concerned municipalities. The report was relied on by both parties and the court has taken judicial notice of it. The report recommended certain construction work along the entire length of Fleischer Brook, including what is referred to as the Lanza Avenue diversion or bypass (at the border of Garfield and the borough) which would carry the water flow past Garfield directly to the Passaic River. The report strongly advised that down-stream work, particularly the diversion project, be completed first, and further land development should be delayed until after completion. The report deals with construction and engineering solutions rather than land use planning and zoning aspects.
The Flood Control Study succinctly states:
Fleischer Brook, although a minor tributary of the Passaic River, traverses a highly urbanized area of Bergen County. Location of the Brook is shown on Plate 1. The drainage basin, with a total area of 2.7 square miles (1730 acres), includes sections of East Paterson (962 acres), Garfield (428 acres), and Fair Lawn (273) and Saddle Brook (67 acres). Based upon the population densities in each *205 municipality in 1970, an estimated 28,000 people reside within the basin. Further urban development within the basin is limited since land use is approaching saturation. [at I-1]
Certain definitions in the report are pertinent to the problem involved in this case:

Surface Runoff
The flow of water which occurs when the rate of precipitation exceeds the rate of infiltration and after the filling of surface depressions, and which finds its way over the surface of the ground until it reaches the beginnings of a definite stream channel system or is intercepted by a storm sewer system.

* * * * * * * *

Design Storm (Return Frequency)
A storm with such a pattern that it may be expected not to recur over a specific period of time. A design storm is said to have a return frequency of so many years, thus a design storm of 20 year return frequency is not expected to recur more than once every 20 years over a long period of time.

Design Flood
The quantity of surface runoff from the design storm to be contained within the confines of the stream channel.
As to a description of the borough, the report stated:

East Paterson
The area of East Paterson within the basin is approaching full development. The dense residential development in conjunction with the Garden State Parkway, Route 46 and Interstate Route 80 has left little open space for further development. Since the 1940's when the population more than tripled from 4,937 in 1940 to 15,386 in 1950, the Borough has shown very slow growth. Between 1960 (19,344) and 1970 (20,293) there has been only a 5 percent increase in population. Future development in this municipality within the drainage basin is therefore anticipated to have a minor effect on increasing the flow to the Brook. [at II-2]
As the Flood Control Study noted, approximately 962 acres in the borough are within the drainage basin of Fleischer Brook. Only about 5 to 10% of this area in the borough is presently undeveloped. Thus, future horizontal urban development is limited, although if fully developed additional surface runoff would reach the brook and at an accelerated *206 pace during rainfalls. The impact of future development was disputed, but the effect of such urbanization upon the ability of Fleischer Brook to convey stormwaters may be seen by comparison of runoff factors between open lands, roofed and paved areas. For open lands, 20 to 35% of the rainfall reaches the Brook as runoff whereas, for roof and paved areas, the runoff ranges from 70 to 95% of the rainfall. Flood Control Study, at I-1.
Although plaintiff apparently concedes that the moratorium was reasonable during the first year, it asserts that all subsequent extensions are unconstitutional, unreasonable and arbitrary, and resulted in a taking of property and prevention of its use without compensation by the borough. Plaintiff relies on Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963). Further, plaintiff asserts that no industrial structure could be built on its property to meet a requirement for the special exception use that "no additional surface run-off of water will be generated * * *," and hence should be held impossible to comply with based on Oakwood at Madison, Inc. v. Madison Tp., 117 N.J. Super. 11, 21 (Law Div. 1971). However, in the Oakwood case the court specifically found nothing in the record to support concern for flooding in connection with a zoning ordinance which required 30% of the town to remain undeveloped.
On April 25, 1973 plaintiff applied to the board of adjustment for a special exception use variance to erect a combination storage warehouse, tractor-trailer maintenance facility for its own trucks, and cardboard box manufacturing facility with related office space. Plaintiff's property is zoned for "E Industrial Use" and is bounded by tracts developed accordingly. In its application to the board of adjustment plaintiff volunteered to straighten, dredge and improve the entire section of Fleischer Brook contained within the boundaries of plaintiff's property at its own expense, in accordance with the recommendations in the Flood Control Study.
Defendant planning board recommended to defendant board of adjustment a denial of the application. The application *207 was denied by the board of adjustment on June 27, 1973 based upon plaintiff's failure to satisfy the criteria required by Ordinance No. 72-15, the 1972 enactment of Ordinance No. 71-13, and the requirements of paragraph C of Ordinance No. 88-17, the borough's zoning ordinance.
Plaintiff presented an expert, a licensed professional engineer, before the zoning board on April 25, 1973. An engineer from the borough's engineering consulting firm was called by the board. Evidence was presented before the board that Fleischer Brook would be changed from its horseshoe, meandering course to a shorter, straight-flowing channel, and widened and deepened. The brook's capacity would be increased several-fold, as would its ability to serve as a water retention basin for water from upstream and increased runoff from the Cappture Realty property, if it were improved. The channel construction would reduce existing flood problems for adjacent tracts. No precise information was presented as to what would happen to tracts below the Cappture Realty property. Both experts explained that if an area downstream of the improvement in Fleischer Brook becomes congested or blocked, back-flooding at the Cappture Realty property and surrounding parcels will be worse than before the improvement. Both witnesses agreed that the standard requiring no additional runoff was extremely difficult to be met by any use permitted in the zone.
There was testimony before the zoning board regarding the number of trucks coming to the property, the maintenance operation for the trucks in the nature of a "private" service station, and the sound and pollution effects from the cardboard box machinery.
The zoning board found that the applicant's request to improve Fleischer Brook would be harmful to the community welfare and that the improvement would neither alleviate nor dispose of the existing flood problem. In addition, the board found that if the brook was obstructed down-stream, the Cappture Realty tract and surrounding land would be flooded in the backup process and if developed under *208 present plans would substantially increase the water input into the stream.
The board of adjustment denied the special exception use variance for several reasons. It could not grant the relief without a favorable advisory opinion of the planning board, which applicant was unable to obtain. Additionally, the board of adjustment found as a fact that the proposed construction would generate additional surface water runoff as prohibited in Ordinance No. 71-13; that the proposed improvements to the Fleischer Brook channel do not conform in either design or location to those recommended in the engineering report; that additional data specifying the noise level and dust and odor production of the cardboard box machinery was not submitted; that a glue operation was to be added to the corrugated box manufacturing, which had not been adequately presented to the board of adjustment; that considerable tractor-trailer traffic would be generated by the warehouse and maintenance operation; that the neighboring property owners were opposed to the proposed use, and that the applicant did not sustain its burden of meeting the criteria under the flood moratorium ordinance and Ordinance No. 88-17. The board of adjustment reserved the right to enter a complete finding of fact if the Cappture Realty Company ever succeeded in obtaining a favorable report from the planning board.
There is little dispute that the flooding of Fleischer Brook has been and is a serious problem today, not only in Elmwood Park, but in down-stream Garfield. The proposed building would have the acknowledged result of increased runoff to Fleischer Brook due to the imperviousness of the soil created by such construction and related paving for a driveway and parking areas. Plaintiff argues the increase would be negligible in view of the size of the parcel and the developed state of the borough.
Defendant borough's expert testified that surface runoff from the undeveloped land of plaintiff was approximately *209 3.84 cubic feet a second, or 28.72 gallons a second. If the land were developed as planned, it was estimated that the surface runoff would be increased to 6.79 cubic feet a second, or 51 gallons a second.[2] The flood control study recommended a flow for Fleischer Brook capable of handling a 15-year design storm or an average of from 450 to 700 cubic feet a second.
The borough concedes it is not now trying to alleviate the situation by amending the zoning of the flood plain area, presently zoned largely industrial. There was also testimony on behalf of the zoning board of concern for eligibility of the area for federal flood insurance. This may prove inconsistent with the zoning of flood plain areas as "Industrial E," and the determination of the municipality to forego flood plain zoning despite the mandate for such eventual zoning by N.J.S.A. 58:16A-50 et seq., as well as requirements for permanent federal flood insurance. See 42 U.S.C.A. §§ 4012 and 4022 et seq.
Thus, this is not an interim ordinance to allow adoption of a comprehensive zoning plan or a revision of the zoning ordinance. Rather, its purpose now is to allow time for the construction of certain specified flood control projects along the length of the brook. The borough conceded in argument, however, that construction of the recommended bypass and certain culverts, as well as other recommended channel improvements (straightening and deepening the channel, etc.), may not solve the flood problem. Nevertheless, the borough urges that the work is necessary and required under its police powers for the health, safety and welfare of its residents. It further urges that the county is proceeding expeditiously, since it approved the report of the engineers and has provided monies in the budget and approved a $5,833,565 bond issue in May 1973 which included these flood projects, as well as many capital items in the county. The county also entered *210 into a January 3, 1973 contract with the municipality of Garfield for a $1,000,000 project for the Lanza Avenue diversion, and has prepared preliminary plans. The borough asserts such actions support the necessity, vitality and validity of the ordinance.
The borough and county are presently preparing for construction intended to alleviate these local flooding conditions. The moratorium zoning ordinances under attack in this case were adopted as interim measures and in anticipation of the construction of flood control projects, and initially the amendment of the zoning ordinance. The purpose of the moratorium is to give citizens in the flood plain area protection against haphazard construction or further development that will increase their flooding problems pending completion of the projects.
Therefore, the moratorium issue comes down to whether a municipality may temporarily delay construction of industrial buildings in an industrial zone for the sole purpose of building and completing flood control projects, and if so, for how long. Of course, if the ordinance is found to be unreasonable or beyond the powers of the municipality, the question of taking of private property without compensation arises, including the measure of damages. The parties agreed that any hearing on any damages would abide the outcome of this case.

I
The considerations which prompted legal recognition of comprehensive municipal planning of land uses are now history. The population explosion, industrial and commercial growth, the race for ratables, the constantly accelerating trend towards greater urbanization, and many other factors precipitated the utilization of zoning as a method of guarding against haphazard land usage detrimental to the public welfare. This is particularly evident in New Jersey, which has been called the most densely populated and most industrialized *211 state in the nation. The court can take notice of the fact that New Jersey, based on the 1970 census, is the most densely populated state in the nation, with 953.1 persons a square mile in 1970. Of course, zoning is merely one instrumentality for the implementation of comprehensive municipal land planning. See Mansfield & Swett, Inc. v. West Orange, 120 N.J.L. 145, 148-150 (Sup. Ct. 1938). The enactment of interim ordinances has been upheld as a recognized and logical addition to comprehensive municipal planning during periods required to create or revise comprehensive zoning plans.
See Monmouth Lumber Co. v. Ocean Tp., 9 N.J. 64 (1952); Deal Gardens, Inc. v. Board of Trustees, Loch Arbour, 48 N.J. 492 (1967); Rockaway Estates v. Rockaway Tp., 38 N.J. Super. 468 (App. Div. 1955), and Campana v. Clark Tp., 82 N.J. Super. 392 (Law Div. 1964).
Indeed, it is precisely because of the exigencies surrounding the requirements for planning and adequate action by a municipality that interim ordinances have been upheld. In Monmouth Lumber Co. v. Ocean Tp., supra, the Supreme Court rejected the argument that a zoning ordinance was an invalid exercise of police powers because it was stop-gap legislation adopted to permit delay in preparation of additional zoning legislation.
* * * Such action is within the intent and purpose of the statutes relating to planning, R.S. 40:55-1 et seq., particularly in view of the constitutional and legislative mandates (N.J. Const. 1947, art. IV, sec. VII, par. 11, supra, and R.S. 40:55-2, supra) that such laws as these shall be construed "most favorably to municipalities." It is entitrely consistent with the theory of planning to provide, after study of the conditions of the community, a means of preventing changes in the character thereof which might be opposed to the theory of planning and zoning pending the formulation of a detailed and complete "comprehensive plan" for the municipality, either new or in substitution for an outmoded plan. [9 N.J. at 75]
In Rockaway Estates v. Rockaway Tp., supra, while city planning consultants were conducting studies with a view *212 towards formulating a comprehensive plan in accordance with which zoning ordinances were to be adopted, plaintiff submitted to the governing body a proposed subdivision of its land looking towards the ultimate construction of 1,200 homes. Two months later a zoning ordinance was adopted which rendered the proposed subdivision illegal. In determining that the zoning ordinance was valid, the court held that the ordinance could not be condemned merely because it was enacted hastily and to some extent as an interim measure to prevent a building project which would destroy aborning the effort to provide for the orderly land use development of the municipality. 38 N.J. Super. at 473.
In Campana v. Clark Tp., supra, the interim ordinance was attacked on the ground that it had been in effect for 31 months although it was originally provided that it was only to be in effect for 18 months. In refusing to strike down the ordinance the court held that 31 months was not an unreasonable amount of time, recognizing the complexity of zoning in a modern context. The court in Campana, 82 N.J. Super. at 397, indicated it was fully aware that while the rights of individual property owners were to be protected, the court also had a duty to the community as a whole not to thwart any reasonable effort to adjust land use to modern needs.
The borough concedes it is not now trying to alleviate the situation by amending the zoning of the flood plain area presently zoned largely industrial.

II
In challenging the borough ordinance plaintiff must overcome the presumption of validity initially attaching to the ordinance. See Gruber v. Mayor, etc., Raritan Tp., 39 N.J. 1 (1962).
There is no question that under the state statute which will require flood plain zoning after delineation of flood plains by the State Department of Environmental Protection, *213 L. 1972, c. 185, effective December 14, 1972, N.J.S.A. 58: 16A-50 et seq., a reasonable amount of time would be necessary to come up with an appropriate ordinance which would meet state and federal requirements. In fact, there may even be an obligation under the zoning law in effect prior and after the enactment of chapter 185 for a municipality to take into account and zone to minimize or prevent damage from floods. N.J.S.A. 40:55-32 expressly states that
Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, flood and other dangers; promote health, morals or the general welfare * * * [Emphasis added]
Although this case now involves a moratorium for flood alleviation construction, there is no rational basis for holding that a municipality may not provide sufficient breathing space in order to complete construction of such flood control projects where the health, safety and welfare (as well as property values) of the people in the municipality are involved. The court finds that the borough needs a reasonable time to handle this complex problem. As an interim enactment plaintiff has not been permanently deprived of its property or of all uses thereof. In fact, construction which affects the flow of Fleischer Brook so as to damage upstream or down-stream property owners may well subject a landowner who so increases the flow, and possibly a municipality and county, to damage suits. See Armstrong v. Francis Corp., 20 N.J. 320 (1956); Kidde Mfg. Co. v. Bloomfield, 20 N.J. 52 (1955); Yonadi v. Homestead Country Homes, Inc., 42 N.J. Super. 521 (App. Div. 1956); Hopler v. Morris Hills Regional District, 45 N.J. Super. 409 (App. Div. 1957); 93 C.J.S., Waters, § 42, and Annotation, 59 A.L.R. 2d 413 (1956). See also, Gellenthin v. J. & D. Inc., 62 N.J. Super. 224 (App. Div. 1960), and 71 N.J. Super. 226 (App. Div. 1961) (on retrial), rev'd 38 N.J. 341 (1962). Cf. Barney's *214 Furniture Warehouse of Newark, Inc. v. Newark, 62 N.J. 456 (1973).
In addition, there has been an increasing number of cases in recent years where further construction has been ordered temporarily halted in municipalities because of the lack of adequate sewage treatment facilities or other health reasons. See, e.g., Bayshore Sewerage Co. v. Dept. of Environmental Protection, 122 N.J. Super. 184 (Ch. Div. 1973). Such construction has been halted on an interim basis because of the potential or actual adverse effects which may result to the public health and welfare.[3]
The court concludes that enactment of the interim ordinance in 1971 was reasonable. The court also finds that under the facts in this case the extensions to date were reasonable and necessary in order to adequately study the problem and make the necessary plans and appropriations. Additionally, some reasonable period of time is needed in which to complete construction and obtain the approvals of other agencies involved. Although construction has not yet begun, two years from the date of this decision would appear a reasonable period within which the borough should obtain necessary approvals and complete, in conjunction with the county, the necessary flood control projects; provided construction is started in good faith within six months and assuming an appropriate extension of the moratorium not to exceed such limits. Failure to meet these limitations would result in the ordinance being unreasonable as to the property of plaintiff. The language of Justice Haneman in Deal Gardens, Inc. *215 v. Bd. of Trustees, Loch Arbour, supra (48 N.J. at 500), is appropriate to quote:
Although the municipality may adopt a "stop gap" zoning ordinance, which if not temporary might be considered unconstitutional, such power is strictly limited and must be exercised with great caution. One of the more dangerous aspects of this type of legislation, arises from the damage which may result if there is no restriction of the period of time during which a restraint against some land use is permitted to continue. Plainly there must be some terminal point. It is impossible to establish an inflexible rule applicable to every case. Each situation must be assayed in its own particular factual setting to ascertain whether the elapsed time during which the ordinance has been in effect is reasonable. See 9 Rutgers L. Rev. 700 (1954-1955).
In Deal Gardens the sole excuse advanced by defendant municipality for allowing the period of time in which to obtain a revised comprehensive zoning plan to far exceed the amount of time needed to complete and finalize the ordinance was inability to obtain federal funds for a planning and zoning survey and the preparation of surrounding zoning restrictions. The court held this inadequate as a reason for the failure to finally act. This court in the present case would also find that such a reason, if it existed, would not be adequate as a future excuse. In any event, it has been represented to the court that county funds have been appropriated and are available and that no federal funds are required in connection with this project.
As pointed out in a report entitled Regulation of Flood Hazard Areas to Reduce Flood Losses, 1972, prepared by the United States Water Resources Council (vol. 1 at 5):
The construction of dikes, dams and levees to control the flow of flood water is most often at public expense. In contrast private land use adjustments to flood hazards are usually at private expense.
Although perhaps unnecessary for this decision, the other side of the coin is often overlooked in analyzing claims by a landowner in a flood area that he should be able to use his *216 land without restriction. If private construction would call for, or perhaps demand or increase the demand for, public flood control projects; does this not call for an expenditure of public funds for the protection of specific private property, or purposes? Reference has also been made to the interest a municipality or county has in not causing damage to upstream or down-stream owners.
Thus, under all the circumstances, including the regional nature of the county flood control program for Fleischer Brook, the court does not find the actions or delay to date unreasonable. See Kozesnik v. Montgomery Tp., 24 N.J. 154, 162-163 (1957). It is recognized that governing bodies need time to deliberate, plan and provide for the necessary funding. This case is obviously distinguishable on this basis from Morris County Land v. Parsippany-Troy Hills Tp., supra, 40 N.J. 539, and the fact that plaintiffs land here is not being set aside as a permanent flood basin. Furthermore, increased urbanization and changing circumstances warrant a more sophisticated approach to flooding problems.
Since the ordinance has been held to be a valid exercise of the police power and temporary in nature, there is no deprivation of property without compensation, as contemplated by U.S. Const., Amendment XIV, and N.J. Const. (1947), Art. I, par. 20. The court having found that the enactments of temporary ordinances were within the police power of the municipality under the zoning laws, and that the period of the moratorium to date has been reasonable (although the borough might have proceeded more expeditiously), this would appear to dispose of the taking question and that of compensation. No right to compensation arises from a valid exercise of the police power. State v. Mundet Cork Corp., 8 N.J. 359 (1959), cert. den. 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637 (1952); Penna.-Reading Seashore Lines v. Bd. of Pub. Utility Comm'rs., 13 N.J. Super. 540 (App. Div. 1951), aff'd 8 N.J. 85 (1951), and Bayshore Sewerage Company v. Dept. of Environmental Protection, 122 N.J. Super. 184, 203-205 (Ch. Div. 1973). See Chicago, *217 etc., R. Co. v. Illinois, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1905); Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); Turnpike Realty Company v. Town of Dedham, Mass. 284 N.E.2d 891 (1972), cert. den. 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 689 (1973).
Plaintiff also argues it is being assessed for taxes as if the land were not under a moratorium, and is paying property taxes under protest. It appears obvious that the moratorium establishes as a matter of law that the subject land is temporarily restricted, and presumably the tax assessor establishes true value accordingly for that period. See N.J. Const. (1947), Art. VIII, § I, par. 1(a), and N.J.S.A. 54:4-2.25 and regulations thereunder. The taxing authorities cannot have it both ways. It may be noted that L. 1972, c. 185, § 10 (N.J.S. 58:16A-61) would require tax assessors to consider the impact of rules or regulations issued pursuant to that act in establishing full value of lands designated as floodways or as flood fringe areas. The court considers this merely a restatement of present law. Thus, in establishing true value of plaintiff's property, if the tax assessor fails to take the moratorium ordinances into account, plaintiff may have been damaged by any such excess assessment. Plaintiff has an avenue for redress through tax appeals, which should be sufficient.

III
Plaintiff also raises several other grounds in its appeal. It argues that the denial of the special exception variance by the board of adjustment was arbitrary and capricious, and that the borough's basic zoning ordinance contains an unlawful delegation of powers to the board of adjustment.

A
Section 88-17 of the borough's zoning ordinance permits industrial uses in the E-Industrial zone if certain requirements of the ordinance are met. These requirements include *218 prohibition of uses which are noxious by reason of emission of odor, dust or noise, or danger to health and safety of the residents; and also include prior written approval of the planning board as to plot, site and building plans, as well as specifications and use.
Plaintiff also asserts that the enabling state legislation, N.J.S.A. 40:55-39(b), does not allow a municipality to condition approval on a favorable opinion from the planning board. Sufficient answer is that the statute expressly provides that the board has power to "hear and decide, in accordance with the provisions of any such ordinance, requests for special exceptions * * *." (Emphasis added). There is no reason, and plaintiff has cited no authority, to prohibit a permit system, or even conditions or restrictions, in various zones if the municipality so chooses. In fact, permits appear rather common conditions. See Kozesnik v. Montgomery Tp., 24 N.J. 154, 163 (1957). Plaintiff calls the court's attention to Home Builders Ass'n of Northern New Jersey v. Paramus, 7 N.J. 335, 341 (1951), and Dallenbach Sand Co. v. Mayor, etc., South Brunswick Tp., 90 N.J. Super. 218 (App. Div. 1966). These cases are not inconsistent with the quoted language of N.J.S.A. 40:55-39(b) and do not prevent the board of adjustment requiring as a condition to its action the favorable approval of a planning board in areas of its expertise. Unless plaintiff had an opportunity to be heard by that board, neither the zoning board nor plaintiff could be bound by the recommendation. However, this defect does not affect the board of adjustment's decision in this case since the other grounds for denial were sufficient.
Actually, the board of adjustment in Elmwood Park acts as a "weak board" and could only recommend approval to the governing body if all proper conditions are met. Certainly, the participation by the planning board in an area of its statutory competence can be taken into account by the zoning board, provided the applicant has an opportunity to be heard. In this case the planning board, although present *219 at the board of adjustment hearing, had erroneously refused to consider plaintiff's application. (See infra).
The board of adjustment found that (1) competent manufacturer's specifications regarding the noise level and other particulars, such as dust and odor of glue from the proposed corrugated box manufacturing machinery, were not submitted; (2) a gluing operation as part of the box manufacturing facility was not fully revealed, and the board of adjustment was unable to obtain sufficient information, and (3) property owners in the area were opposed to the proposed use, particularly relating to the truck traffic and noise and possible increase in flooding.
The testimony at the hearing on the subject of the corrugated box machinery and the letter and advertisements subsequently submitted by plaintiff were not expert. Plaintiff had agreed to submit expert, specific information so the board could study the effects of the machinery. Such competent evidence was not adduced.
At the hearing before the board of adjustment the applicant was asked if the warehouse would contain gluing machinery for the corrugated boxes. It was initially stated that a gluing operation would not be present, but applicant subsequently stated it was a part of the proposed operation.
The present case is distinguishable from Yanow v. Seven Oaks Park, Inc., 18 N.J. Super. 411 (1952), rev'd and remanded 11 N.J. 341 (1953). The Elmwood Park Board of Adjustment merely found as a matter of fact that the neighboring residents were opposed to the Cappture Realty use. The zoning ordinance did not require the approval of the neighbors as a prerequisite for approval of the special exception use. The municipality has not delegated a legislative power to individual citizens or property owners. Yanow v. Seven Oaks Park, Inc., supra, 18 N.J. Super. at 414.
Plaintiff also challenges the fourth "finding" of the board of adjustment which reserves the right to enter a complete finding of facts at such time as it may be determined that the application might properly be considered by *220 the board. Such additional findings apparently related to the corrugated box and gluing operations if new competent evidence was submitted. In this case, on the evidence before it, the board of adjustment made sufficient findings of fact to warrant a denial of the special exception use variance. The resolution by the board is distinguishable from Grundlehner v. Dangler, 29 N.J. 256 (1959), where none of the findings and none of the special reasons were set forth. The Elmwood Park Board of Adjustment set forth its findings and special reasons in clear, explicit terms. Grundlehner, supra, 29 N.J. at 271.
The record before the board of adjustment indicated that the project had not been fully disclosed in the application. The testimony before the board indicated there would be considerable truck traffic and repair facilities for plaintiff's vehicles. In effect, there would be a private gas filling and repair truck terminal for plaintiff's fairly large fleet. Zoning ordinances have traditionally treated gas stations as sui generis, although admittedly the gasoline and service facility were to be for the private use of plaintiff. Based on the testimony as to the extent of truck traffic and use, the operation of machinery, noise and dust, the court finds no basis to set aside the denial of this specific use and, under all the circumstances, including the planned flood construction facilities, does not find the action of the board of adjustment arbitrary or capricious.
Plaintiff also asserts that no one could meet the criteria of creating no additional surface runoff, citing Oakwood at Madison, Inc. v. Madison Tp., 117 N.J. Super. 11, 21 (Law Div. 1971). In light of the court's previous holding that the moratorium was reasonable and of temporary duration, it is not essential for the court to consider the point at this time. In construing statutes or ordinances, if there is a reading which would sustain the particular provision, the court attempts to give effect to the legislative enactment, and this would require a finding that the ordinance did not prohibit inconsequential increases in runoff since even a leaf or board *221 on the ground might arguably increase runoff. There was no evidence of possible construction of buildings on pilings, use of catch basins, or similar measures to prevent substantial runoff or what uses might be permitted under alternate interpretations other than possibly using crushed stone for driveway paving.
From the evidence presented to the board of adjustment it is apparent that the applicant failed to adduce sufficient competent evidence to set aside the decision of the board.
Plaintiff also objected to the failure or refusal of the planning board to consider its plot plan and site plan. During the course of this proceeding the court entered an order, on plaintiff's motion, directing that the planning board review the same. Defendant municipality agreed to its entry. Therefore, that objection is moot.
NOTES
[1] The Borough of Elmwood Park was formerly called the Borough of East Paterson.
[2] 1 cu. ft. = 7.48 gallons.
[3] Legislation has also been adopted recognizing that there are critical areas in the State where unregulated development may be inimical to the public welfare. See, e.g., N.J.S.A. 13:9A-1 (Wetlands Act); N.J.S.A. 13:19-1 (Coastal Area Facility Review Act); N.J.S.A. 58:11-44 (Critical areas  septic systems); N.J.S.A. 58:11-24 (controls on large subdivisions); N.J.S.A. 58:16A-50 (flood plains); N.J.S.A. 58:10-23.25 (Clean Ocean Act), and N.J.S.A. 13:17-1 (Hackensack Meadowlands).