Peter C. **DROSTE,** individually and as Trustee of a trust for the benefit of Peter C. Droste, Jr. and Elise Droste; and Bruce F. Droste, individually and as Trustee of a trust for the benefit of Edward Droste and William Droste, Petitioners

v.

The **BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF PITKIN, Colorado,** Respondent.

No. 05SC823.

Supreme Court of Colorado,
En Banc.

May 14, 2007.

Rehearing Denied May 29, 2007.*

* Justice Coats and Justice Eid would grant the    Petition.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Jody Harper Alderman, Carrie S. Bernstein, Denver, Colorado, Attorneys for Petitioners.

Pitkin County Attorney's Office, John M. Ely, Aspen, Colorado, Attorneys for Respondent.

Boulder County Attorney's Office, David Hughes, Boulder, Colorado, Hall & Evans, LLC, Thomas J. Lyons, Denver, Colorado, Attorneys for Amici Curiae Boulder County and Colorado Counties, Inc.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' opinion in *Droste v. Board of County Commissioners*, 141 P.3d 852 (Colo. App.2005).[1] By means of section 30–28–

1. The petitioners presented the following issue for review:

Whether the court of appeals erred by concluding that the Local Government Land Use Control Enabling Act, section 29–20–101, *et seq.*,

106(4)(b), the General Assembly required Pitkin County to adopt a master plan for its unincorporated area by January 8, 2004. Through a public hearing on April 9, 2003, the Board of County Commissioners of Pitkin County adopted an ordinance imposing a temporary moratorium preventing all county departments, agencies, and boards from processing land use applications, with certain exceptions, in the Owl Creek Planning Area and the lower Brush Creek Valley, pending adoption of the master plan. The ordinance stated that the anticipated length of the moratorium would be sixty days. Through a public hearing on May 14, 2003, the County Commissioners enacted a second ordinance providing that the moratorium would continue through completion of the master planning process anticipated to be completed under the revised schedule by January 1, 2004.

Certain land owners affected by the moratorium challenge its validity. They contend that the only authority for a moratorium in Colorado land use law is section 30–28–121, C.R.S. (2006), which limits such regulation to (1) the context of zoning plan adoption and (2) a duration of up to six months only.

We agree with the District Court for Pitkin County and the court of appeals that Pitkin County had authority under sections 29–20–101 to –107, C.R.S. (2006) to adopt ordinances, confirmed through public hearings, imposing a temporary moratorium on land use application reviews that lasted approximately ten months, while it prepared its master plan.

## I.

The petitioners in this case include several members of the Droste family ("Drostes"). The Drostes own approximately 925 acres of land lying between the City of Aspen and the Town of Snowmass Village commonly known as the Droste Ranch. In March of 1974 Pitkin County (the "County") zoned the Droste Ranch AF–1, a zoning designation that permitted single-family dwellings "by right" on lots of ten acres or more. In 1975 the County designated the Droste Ranch as an area containing or having a significant impact on natural resources of statewide importance, but did not alter the zoning.

In 1996 the County purchased a conservation easement for approximately 100 acres of the Droste Ranch for $480,000. The County purchased an additional conservation easement covering 500 acres of the Droste Ranch in 1999 for $7.5 million. In both conservation easements the parties agreed to preserve critical wildlife habitats, particularly elk migration corridors.

In 2000 and 2002 the Drostes applied for approval of three separate development projects, each of which was denied. In February of 2003 a representative of the Drostes conferred with a representative of the County regarding three potential new applications for development, but the Drostes did not file any applications at that time.

The Board of County Commissioners for Pitkin County (the "Board") adopted Ordinance Number 13–2003, confirmed through a public hearing on April 9, 2003. This resolution imposed a moratorium on all land use applications effective March 12, 2003. The moratorium's stated purpose was to allow the County time to conduct a comprehensive study of the area, including sensitive environmental areas and significant wildlife habitats. This study was necessary as part of the process of adopting a master plan by January 8, 2004, as required of Pitkin County by section 30–28–106(4)(b).

The Board's ordinance includes the following findings:

3. The State of Colorado has mandated that all areas of unincorporated Pitkin County be subject to a master plan by no later than January of 2004. Much of the moratorium area has never been subject to a master planning effort. The anticipated master planning process will create a master plan for Owl Creek Valley and appropriate amendments to the Downvalley

C.R.S., supersedes section 30–28–121, C.R.S., of the County Planning and Building Codes, thereby allowing the imposition of a temporary moratorium without a stated termination date that precludes all development activities while a Board of County Commissioners adopts resolutions for the master planning and rezoning of property that has already been zoned.

Master Plan concerning the lower Brush Creek Valley.

4. The Owl Creek Planning area is currently being examined by the County Planning staff and the Owl Creek Caucus to produce a comprehensive Master Plan. This existing caucus and planning area is contiguous to areas in the lower Brush Creek Valley, which share many of the same physical and neighborhood characteristics and are experiencing the same pressure for development. This area lies between United States Forest Service land and Wildcat Ranch within the Town of Snowmass Village, which in many circumstances contains critical wildlife habitat and migratory corridors for deer and elk between the United States Forest Service land and the preserved open space of Wildcat Ranch.

5. The moratorium is to allow time to conduct a comprehensive study of what appropriate zoning and development regulations should be imposed as a result of the Master Plan process. This study shall examine what appropriate development density and development intensity should be approved in the moratorium area. The intent of the [Board] in enacting this moratorium is to allow sufficient time to conclude the County Master Plan process and enact appropriate zoning regulations to implement the adopted Master Plan.

6. There is an emergency that warrants the enactment of this ordinance and temporary moratorium. Failure to impose proper regulations will allow development to proceed, which may be out of character with the community and will negatively affect the cultural, environmental and neighborhood qualities of the moratorium area. It is anticipated by the Board of County Commissioners that an appropriate analysis of the area and adoption of necessary zoning regulations can be accomplished within sixty (60) days.

The Board adopted a second ordinance, confirmed through a public hearing, to provide for a moratorium through the first week of January 2004 in order to complete the master plan process. The second ordinance recited steps the planning staff had taken since adoption of the first ordinance, including "determination of the basic parameters for wildlife protection" and a work program for "completion of the Master Plan review process and drafting of the final Master Plan" by January 1, 2004. In total, the moratorium lasted approximately ten months.

The Drostes filed suit against the Board on May 14, 2003, seeking a declaratory judgment that the County lacked authority to impose the moratorium, and praying for injunctive relief. The parties filed cross motions for summary judgment. The County argued that it had the power to enact moratoria under the Areas and Activities of State Interest Act, section 24–65.1–101, *et seq.*, C.R.S. (2006)("H.B. 1041") and the County's general police power. The Drostes countered that the only authority to impose moratoria in Colorado land use law is found in section 30–28–121, which limits such regulation to (1) the context of zoning plan adoption and (2) a duration of up to six months only.

The trial court granted summary judgment to the County, finding that it had authority to enact the moratorium at issue pursuant to H.B. 1041 and its general police power. In November of 2003 the Drostes filed a motion for the trial court to amend its judgment. Relying on *Droste v. Board of County Commissioners*, 85 P.3d 585 (Colo.App.2003), the Drostes pointed out that the court of appeals' recent decision in their favor held that H.B. 1041 did not apply to lands zoned prior to May 17, 1974.

Neither party disputes that the Droste Ranch was zoned prior to May 17, 1974. The trial court amended its earlier judgment to add that the County had authority to impose the moratorium for the purpose of preparing a master plan under its general police power and the Local Government Land Use Control Enabling Act of 1974, sections 29–20–101 to – 107 ("Land Use Enabling Act"), as well as H.B. 1041.

The Drostes appealed and the court of appeals affirmed. Without addressing H.B. 1041 or general police powers as possible sources of authority, the court of appeals ruled that the County had authority to impose the moratorium at issue in this case

pursuant to the Land Use Enabling Act. We uphold the judgment of the court of appeals.

## II.

■ We hold that Pitkin County had authority under sections 29–20–101 to –107 to adopt ordinances, confirmed through public hearings, imposing a temporary moratorium on land use application reviews that lasted approximately ten months, while it prepared its master plan.

## A.

### Standard of Review

■ The standard for review of this land use case is set forth in another of our land use decisions, *Board of County Commissioners v. Bainbridge*, 929 P.2d 691, 699 (Colo. 1997). Counties have only those powers that are expressly granted to them by the Colorado Constitution or by the General Assembly. *Pennobscot v. Bd. of County Comm'rs*, 642 P.2d 915, 918 (Colo.1982). Those powers include all of the implied powers reasonably necessary to the proper exercise of the delegated powers. *Id.*

■ Statutes are to be construed as a whole to give a consistent, harmonious, and sensible effect to all of their parts. *Bainbridge*, 929 P.2d at 699. When we interpret a comprehensive legislative scheme, we must give meaning to all portions thereof and construe the statutory provisions to further the legislative intent. *Id.* In construing a statute, we look first to the plain language of the statute and the words should be given their plain and ordinary meaning. *Id.* If the statutory language is clear and unambiguous, the statute must be interpreted as written. *Id.*

## B.

### The Land Use Enabling Act of 1974

The General Assembly enacted the Land Use Enabling Act in recognition that "rapid growth and uncontrolled development may destroy Colorado's great resource of natural scenic and recreational wealth." *Theobald v. Bd. of County Comm'rs*, 644 P.2d 942, 947 (Colo.1982). During the 1960s and 1970s Colorado experienced incredible population growth. In the 1960s population increased by 25.8 percent in the state. Christopher J. Warner, *Of Growth Controls, Wilderness and the Urban Strip*, 6 The Colorado Lawyer 1730, 1734 (Oct.1977). In contrast, national population increased by 9.3 percent. *Id.* In the mountain counties like Pitkin, the predominate growth concerns centered on impacts to wildlife, the environment, and recreation, while urban area concerns centered on suburban sprawl. *Id.*

In turn, these concerns triggered widespread public anxiety and anti-growth sentiment. Kirk Wickersham, Jr., *Land Use Management in Colorado: Past, Present and Future*, 6 The Colorado Lawyer 1778 (Oct.1977). However, legislative attempts to address land use legislation on a statewide basis largely failed. Instead, the General Assembly focused on local government authority. Barbara J. Green & Brant Seibert, *Local Governments and House Bill 1041: A Voice in the Wilderness*, 19 The Colorado Lawyer 2245 (Nov.1990).

City and county attorneys complained that the existing power of local governments to control development was inadequate to deal with the full range of contemporary land use conflicts. The General Assembly responded in 1974 by enacting (1) the Land Use Enabling Act, H.B. 1034, which conferred broad authority for local government planning and regulation of land use, and (2) the Areas and Activities of State Interest Act, H.B. 1041, which allowed local government to designate matters of statewide interest for regulation through a permit system. Michael D. White and Raymond L. Petros, *Land Use Legislation: H.B. 1034 and H.B. 1041*, 6 The Colorado Lawyer 1686, 1687 (Oct.1977).

The Land Use Enabling Act broadly empowers local governments to plan for and regulate land use within their jurisdictions:

The general assembly hereby finds and declares that in order to provide for planned and orderly development within Colorado and a balancing of basic human needs of a changing population with legitimate environmental concerns, *the policy of this state is to clarify and provide broad*

*authority to local governments to plan for and regulate the use of land within their respective jurisdictions.*

§ 29–20–102(1), C.R.S. (2006) (emphasis added). The statute expressly includes a number of provisions identifying particular examples of allowable land use regulation, culminating in a catch-all provision that confers comprehensive local authority to make land use decisions, subject to the constitutional rights of the property owner:

(b) Protecting lands from activities which would cause immediate or foreseeable material danger to significant wildlife habitat and would endanger a wildlife species;

. . . .

(e) Regulating the location of activities and developments which may result in significant changes in population density;

. . . .

(g) Regulating the use of land on the basis of the impact thereof on the community or surrounding areas; and

(h) Otherwise planning for and regulating the use of land so as to provide planned and orderly use of land and protection of the environment in a manner consistent with constitutional rights.

§ 29–20–104, C.R.S. (2006). The statutory definition of "local government" includes counties. § 29–20–103(1.5), C.R.S. (2006).

The Land Use Enabling Act also contains a provision that we have construed as codifying the familiar rule that a specific provision controls over a more general provision. *Bainbridge,* 929 P.2d at 707; *see also Pennobscot,* 642 P.2d at 919. Section 29–20–107 provides "where other procedural or substantive requirements for the planning for or regulation of the use of land are provided by law, such requirements shall control."

In the field of land use regulation, moratoria are often employed to preserve the status quo in a particular area while developing a long-term plan for development. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 337, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (citations omitted). The moratorium is an "essential tool of successful development." *Id.* at 337–38, 122 S.Ct. at 1487 (citations omitted). It counters

the incentive of landowners to develop their land quickly to avoid the consequences of an impending land use plan for the jurisdiction. *Id.* at 339, 122 S.Ct. at 1488.

Other states have recognized the broad authority of local governments to use moratoria in furtherance of growth planning. *See, e.g., WCI Communities, Inc. v. City of Coral Springs,* 885 So.2d 912 (Fla.App.2004); *Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819 (1976); *State ex rel. The Diehl Co. v. City of Helena,* 181 Mont. 306, 593 P.2d 458 (1979); *Cappture Realty Corp. v. Bd. of Adjustment,* 126 N.J.Super. 200, 313 A.2d 624 (1973); *In the Matter of Dune Assoc., Inc. v. Anderson,* 119 A.D.2d 574, 500 N.Y.S.2d 741 (N.Y.App.Div.1986); *McCurley v. City of El Reno,* 138 Okla. 92, 280 P. 467 (1929); *Sun Ridge Dev., Inc. v. City of Cheyenne,* 787 P.2d 583 (Wyo.1990).

Our General Assembly has made clear its explicit intent to promote well-planned growth through the Land Use Enabling Act, sections 29–20–101 to –107. In section 30–28–106(4)(b), the legislature required Pitkin County to adopt a master plan: "the counties of . . . Pitkin shall adopt a master plan within two years after January 8, 2002." Section 30–28–107 mandates that, in preparation of a county or regional master plan, a county or regional planning commission shall make careful and comprehensive surveys and studies of the existing conditions and probable future growth of the territory within its jurisdiction:

*Surveys and studies.* In the preparation of a county or regional master plan, a county or regional planning commission shall make careful and comprehensive surveys and studies of the existing conditions and probable future growth of the territory within its jurisdiction. The county or regional master plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the county or region which, in accordance with present and future needs and resources, will best promote the health, safety, morals, order, convenience, prosperity, or general welfare of the inhabitants, as well as efficiency and economy in the process of development,

including such distribution of population and of the uses of land for urbanization, trade, industry, habitation, recreation, agriculture, forestry, and other purposes as will tend to create conditions favorable to health, safety, energy conservation, transportation, prosperity, civic activities, and recreational, educational, and cultural opportunities; will tend to reduce the wastes of physical, financial, or human resources which result from either excessive congestion or excessive scattering of population; and will tend toward an efficient and economic utilization, conservation, and production of the supply of food and water and of drainage, sanitary, and other facilities and resources.

§ 30–28–107. The question in this case is whether, in light of all the applicable provisions of Colorado's land use statutes, the General Assembly's grant of land use authority to local government necessarily implies the authority to adopt temporary moratoria that suspend review of development applications for a reasonable period of time necessary to prepare master plans. We conclude that it does.

### C.

### The Power to Impose Moratoria Granted by the Enabling Act Is Not Limited by the County Planning and Building Codes

The Drostes argue that a provision of the County Planning and Building Codes grants counties the authority to impose moratoria only in the context of zoning plan approval and then only for a period of up to six months.[2] We disagree.

■ Section 29–20–107 provides that, where other procedural or substantive requirements for the planning for or regulation of the use of land are provided by law, such requirements shall control. This provision operates in the Land Use Enabling Act to codify the familiar rule that a specific provision controls over a more general provision.

---

**2.** There is no contention in this case that the ten month moratorium that occurred in Pitkin County constitutes a taking under the laws of Colora-

*Bainbridge*, 929 P.2d at 707; *see also Pennobscot*, 642 P.2d at 919.

Section 30–28–121 provides that a board of county commissioners, without holding a public hearing, may adopt a temporary moratorium for no more than six months in the context of zoning plan adoption:

The board of county commissioners of any county, after appointment of a county or district planning commission and *pending the adoption by such commission of a zoning plan,* where in the opinion of the board conditions require such action, may promulgate, *by resolution without a public hearing, regulations of a temporary nature, to be effective for a limited period only and in any event not to exceed six months, prohibiting or regulating* in any part or all of the unincorporated territory of the county or district *the erection, construction, reconstruction, or alteration of any building or structure used or to be used for any business, residential, industrial, or commercial purpose.*

§ 30–28–121 (emphasis added).

We must harmonize, if possible, the broad authority contained in the Land Use Enabling Act and the temporary moratorium provision of section 30–28–121 of the planning and building statutes, giving effect to each and all of them. *Bainbridge*, 929 P.2d at 699. These provisions are easily harmonized through a plain reading of each statute. Section 30–28–121 authorizes local governments, in connection with adoption of a zoning plan, to enact temporary regulations *"without a public hearing"* for a limited period of time not to exceed six months. Temporary regulations enacted pursuant to this statute may prohibit or regulate the erection, construction, reconstruction, or alteration of any building or structure used or to be used for any business, residential, industrial, or commercial purpose.

In contrast, the Land Use Enabling Act confers very broad land use authority on local government. Pitkin County did not impose its moratorium without a public hearing. Rather, it proceeded through the public

---

do or the United States. Instead, this is a statutory construction case.

hearing process to impose the moratorium at issue in this case, with the purpose of delaying development application reviews until the master plan was prepared.

The purpose of a master plan is to guide and accomplish coordinated, adjusted, and harmonious development of the county that, in accordance with present and future needs, will best promote the health, safety, morals, order, convenience, prosperity, or general welfare of the inhabitants. § 30–28–107; *Bainbridge*, 929 P.2d at 699. Section 30–28–106(4)(b) explicitly requires Pitkin County to adopt a master plan. Section 30–28–107, in furtherance of master planning, requires careful and comprehensive surveys and studies of the existing conditions and probable future growth of the territory within its jurisdiction. Section 30–28–106(1), C.R.S. (2006), requires a public hearing in connection with the adoption of a master plan. In order to comply with these statutory requirements, the County utilized its authority to regulate under the Land Use Enabling Act to temporarily halt new development, preventing development potentially in conflict with the master plan.

The ordinance the County enacted imposing a moratorium in connection with its master planning process identified the necessity of studying sensitive environmental areas and significant wildlife habitats. The Land Use Enabling Act explicitly delegates to the County the power to regulate land in order to protect significant wildlife habitats or species while balancing human needs and environmental concerns. §§ 29–20–104(b) & –102. The County had previously designated the Droste Ranch as an area of environmental significance, and both the County and the Drostes had acknowledged the existence of significant wildlife habitats on the Droste Ranch in the two conservation easements impacting the property. Accordingly, the County imposed the moratorium at issue in this case for the purpose of advancing several of the policies enunciated by the Land Use Enabling Act.

■ We conclude that section 30–28–121 of the planning and building statutes does not apply to this case. It pertains to temporary moratoria adopted without a public hearing in connection with the adoption of a zoning plan. We construe this provision as an additional grant of authority to local government in the context of zoning plan adoption, i.e., that the local government may adopt a moratorium for a six month duration, without a public hearing. This section does not conflict with, preempt, or control the local government's necessarily implied authority to adopt a reasonable moratorium of sufficient duration to prepare a master plan.

■ In conclusion, the case before us involves a moratorium of ten months duration confirmed through a public hearing and adopted in connection with a master plan. The Land Use Enabling Act includes the necessarily implied authority of the local government to impose, through a public hearing process, a moratorium of limited duration to halt further development pending adoption of a master plan. The length and conditions of a moratorium are subject to the protection of property owners against uncompensated takings as provided by sections 29–20–201 to –204.

### III.

Accordingly we affirm the judgment of the court of appeals.

Justice EID dissents and Justice COATS joins in the dissent.

Justice EID, dissenting.

The right to use one's property is guaranteed by the Colorado Constitution, although it is subject to the proper exercise of the government's police power. *See W. Income Props., Inc. v. City & County of Denver*, 174 Colo. 533, 485 P.2d 120 (1971). Zoning is one manifestation of the government's police power to regulate property use. *See City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244 (Colo.2000). As the majority acknowledges, however, local governments like Pitkin County do not possess a general zoning police power—at least not before today. Rather, they "have only those powers that are expressly granted to them by the Colorado Constitution or by the General Assembly." Maj. op. at 605. In the

case before us, the General Assembly has granted local governments the authority to bypass standard zoning procedures (and the due process interests they serve) through moratoria—but only through moratoria lasting six months or less. *See* § 30–28–121, C.R.S. (2006). Today, the majority approves a moratorium of limitless duration, one effective "until formally terminated by the Board of County Commissioners." Because such a moratorium exceeds the scope of authority granted to local governments by the General Assembly, I respectfully dissent.

The majority's opinion repeatedly refers to the moratorium at issue in this case as "temporary." *See, e.g.,* maj. op. at 603, 605, 607. It is true that, in this particular case, the Pitkin County Commissioners decided to end the moratorium after ten months. *Id.* at 603. But there is nothing in the moratorium itself that would indicate that it had an end date; the end date was purely discretionary with the County Commissioners. *See* Pitkin County Ordinance No. 13–2003 at ¶ 7 ("This moratorium shall remain in effect until formally terminated by the Board of County Commissioners."). In other words, although the moratorium did in fact last ten months, there was nothing preventing it from lasting twenty or thirty months. Nor would the majority's opinion prevent such a result so long as a court—after extended litigation between the county and affected property owners—deemed the duration "reasonable." Maj. op. at 607, 608.

The Local Government Land Use Control Enabling Act of 1974 (the "Land Use Enabling Act") gives "broad authority to local governments to plan for and regulate the use of land within their respective jurisdictions." § 29–20–102(1), C.R.S. (2006). Yet that "broad authority" is not unlimited. Section 29–20–107 provides that "where other procedural or substantive requirements for the planning for or regulation of the use of land are provided by law, such requirements shall

control." The six-month time limitation on moratoria contained in section 30–28–121 is such a "requirement[ ] for the planning for or regulation of the use of land ... provided by law" that should control in this case.

The majority concludes that the six-month limitation does not apply here because section 30–28–121 deals only with moratoria imposed without a hearing, and a hearing was held in this case. Maj. op. at 607–08. But the hearing was held on April 9, 2003— nearly a month after the Board of County Commissioners adopted the moratorium.[1] The moratorium was thus imposed, at least for part of the time, without a hearing. More importantly, the fact that section 30–28–121 permits moratoria to be imposed without a hearing does not imply that the six-month time limitation can be dispensed with as long as a hearing is held. The six-month limitation is still a "requirement[ ] ... provided by law." § 30–28–121. The General Assembly has allowed local governments to depart from standard zoning procedures— and the due process interests that they protect[2]—but only for a temporary period of time: six months or less. The majority attempts to craft a substitute moratoria power: one that is limitless on its face but in fact lasts for what a court, after the fact, deems to be a "reasonable" amount of time. The problem with the majority's substitute power is that it bears little resemblance to the authority actually granted local governments by the General Assembly.

As the majority recognizes, the "requirements" clause contained in the Land Use Enabling Act is a restatement of the "familiar rule that a specific provision controls over a more general provision." Maj. op. at 606, 607 (citing *Pennobscot v. Bd. of County Comm'rs,* 642 P.2d 915, 919 (Colo.1982)). Section 30–28–121 is a very specific provision dealing with moratoria; the Land Use Enabling Act, by contrast, talks in broad and general terms and contains no reference to moratoria. *See id.* at 607–08. Section 30–

---

1. Pitkin County's home rule charter permits the imposition of "emergency" ordinances prior to a hearing. *See* Pitkin County Home Rule Charter ¶ 2.8.2.3.

2. *See Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878 (Colo.1983) (holding that the enactment of zoning regulations "through the usual legislative process" specified by Colorado law is consistent with due process).

28–121's six-month limitation must therefore control. This is not a case in which the two provisions in question were adopted at different times but address the same subject. *Cf. West v. Roberts,* 143 P.3d 1037, 1046–47 (Colo.2006) (Eid, J., dissenting). In this case, the General Assembly enacted the Land Use Enabling Act and the temporary moratoria provision in 1974 in the *same legislation.*[3] *See* 1974 Colo. Sess. Laws 353, 353–55. Under the majority's reasoning, the General Assembly imposed the six-month time limitation on moratoria while at the same time endowing local governments with the authority to evade that limitation.

The majority also finds it significant that section 30–28–121 uses the term "zoning," and suggests that the provision is inapplicable in this case because the Pitkin County Commissioners were engaged in the master planning process. Maj. op. at 607–08. Yet the majority's distinction between master planning and zoning is refuted by the moratorium itself, which states that "[t]he moratorium is to allow time to conduct a comprehensive study *of what appropriate zoning and development regulations* should be imposed as a result of the Master Plan process." Pitkin County Ordinance No. 13–2003 at ¶ 5 (cited in maj. op. at 604) (emphasis added); *see also id.* at ¶ 6 ("It is anticipated by the Board of County Commissioners that an appropriate analysis of the area and adoption of *necessary zoning regulations* can be accomplished within sixty (60) days.") (cited in maj. op. at 604) (emphasis added). We, ourselves, have blurred the distinction between zoning (land use regulation that is legislatively imposed and binding) and master planning (land use planning that is merely advisory), finding that a master plan can be binding as long as it is legislatively imposed. *Bd. of County Comm'rs v. Conder,* 927 P.2d 1339, 1347 (Colo.1996); *but see id.* at 1351 (Kourlis, J., dissenting). Clearly, the County Commissioners in this case were anticipating that they would enforce the provisions of the master plan through zoning regulations. The end result of today's decision is that this court is willing to relax the dis-

tinction between master planning and zoning when doing so would expand government authority, as in *Conder,* but not when it would limit government authority, as here.

Finally, I respectfully dissent from the majority's reliance upon "the local government's *necessarily implied authority* to adopt a reasonable moratorium of sufficient duration to prepare a master plan," maj. op. at 608 (emphasis added)—authority that the majority divines from "all the applicable provisions of Colorado's land use statutes," *id.* at 607. While we previously have recognized that local governments have incidental powers necessary to effectuate the express delegation of authority, *see City of Central v. Axton,* 150 Colo. 414, 373 P.2d 300 (1962), the authority to issue moratoria that the court recognizes today is so limitless that it can only be described as a general zoning police power. This notion is entirely inconsistent with section 30–28–121, which expressly imposes a time limitation on moratoria.

A moratorium that lasts longer than the six months provided in section 30–28–121 may be a land use tool that counties need to manage growth. *See* Amicus Brief of Boulder County and Colorado Counties, Inc. (arguing for broad development moratorium powers). But they need to get that authority from the General Assembly, not from us. I therefore respectfully dissent from the court's opinion.

I am authorized to state that Justice COATS joins in this dissent.

---

**3.** Section 2 of the Enabling Act now appears in section 30–28–121 of the Colorado Revised Stat-

utes.