CITY OF NEWARK, PLAINTIFF, v. TOWNSHIP OF
VERNON, DEFENDANT.

Tax Court of New Jersey

April 1, 1980.

*Philip S. Elberg,* for plaintiff.

*Rosenblum & Rosenblum,* for defendant (*Leo Rosenblum,* appearing).

EVERS, J. T. C.

The City of Newark appeals the denial of the Sussex County Tax Board of its claim for a reduction of assessments of 5,424 acres of vacant watershed land in the Township of Vernon for the years 1973, 1974 and 1976. In addition to valuation, issues concerning discrimination in assessments and the impact on value of Vernon's zoning ordinance are involved. The assessments follow.

| Block | Lot | Acreage | Per Acre Assessment | Assessment |
|-------|-----|---------|---------------------|------------|
| 203 | 1 | 1,998 | $1,000 | $1,998,000 |
| 203 | 1A | 292 | 1,100 | 321,000 |
| 210 | 7 | 1,588 | 850 | 1,348,800 |
| 240 | 2 | 1,506 | 512 | 771,000 |
| 240 | 5 | 40 | 1,550 | 62,000 |
| | | 5,424 | | $4,500,800 |

Using the comparable sales approach, Vernon's expert was of the opinion that the true value of the land was $5,810,600, or over $1,000,000 in excess of the assessment. For 1973 Newark's expert valued the land at $2,765,000 and, due to the alleged discrimination and restrictive zoning ordinance adopted in March 1973, at $1,077,000 for the remaining years. No discrimination was alleged for 1973, the year a revaluation program was effective.

Although the testimony consumed five days, it was extremely difficult to describe the premises with precision because of the nature of this vast acreage. Generally, the lands are part of the 35,000-acre Pequannock Watershed (approximately two times the size of Newark), which was purchased by Newark at the turn of the century to provide a water supply. The watershed, which contains five major bodies of water, is located in Vernon and Hardyston in Sussex County, Jefferson, Rockaway and Kinnelon in Morris County, and West Milford in Passaic County. The Newark-owned lands comprised approximately 86% of the watershed, with the balance in private ownership.

The area is rural in character[1], with occasional dwellings fronting on the roadways. During the period in question Vernon had already commenced its transformation from a relatively sparsely developed summer lake community to a major all-season recreational area. Vast tracts in Vernon and adjacent communities had been purchased by the State under Green Acres programs. Several major ski resorts had been established and the well-known Playboy Resort Hotel had been constructed. Many of the former summer lake dwellings had been transformed into all-year residences and, in fact, immediately to the north of the subject lands is the relatively large and substantially developed Highland Lakes community which consists of both year-round and seasonal homes. Such developments, while indicating the existence of a market for lands such as those under consideration, is not to suggest that Vernon was in the throes of a building boom. In 1975 this 67 square mile township had a population of 7,965 people.

The five tax lots, although separated by roadways, are contiguous, and with the exception of a 292-acre reservoir (Block 203, Lot 1A), are characterized by some severe slopes, major rock outcroppings and wet, swampy areas. With the exception of the reservoir lot and the 40-acre Block 240, Lot 5, the parcels are substantial in size, ranging from 1,506 acres to 2,290 acres. The lands are served by several well-maintained roadways which lend extensive frontage to all parcels, a point emphasized by Vernon in arriving at its values. While each has some, if not all, of the characteristics of the others, Block 240, Lot 2 was described as being less desirable than the balance of the lands. This fact is confirmed by a comparison of the values and original assessments of this parcel with the others which clearly shows that all parties found its value to be approximately 60% of that of the other lots.

---

[1] Of the township's 10,107 tax line items in 1975, 116 were commercial, 9 industrial and 2 apartments, with the remainder consisting of vacant land, farms and residential.

Two other points with respect to size and composition of the lands are to be observed in our analysis. Block 240, Lot 5, contains 40 acres, a fact which, in the market place, usually results in a higher per-acre value. This tax lot, however, is a part of a large contiguous tract located in Hardyston. There is no basis for the suggestion that, because of the municipal boundary line, this large tract would be mentally subdivided in the market place and thus treated as two distinct sales transactions. For valuation purposes, therefore, this parcel will be accorded the same treatment as the larger tax lots with which it favorably compares in all other respects.

Secondly, the reservoir parcel, which is comprised solely of a 292-acre body of water, was valued by Newark in a manner which finds no support in either the record or the market area under consideration. Treating it as separate and apart from the remainder of the 5,424 acres, Newark arbitrarily assigned a nominal value of $100 an acre to this lot. Vernon's approach, although not its conclusions, in evaluating this lot as part and parcel of the surrounding 1,998-acre Block 203, Lot 1, which approach finds support in the market and in the actual development of the many area lake communities, will be adopted here.

In light of the above, the varying sizes of these tax lots are of no consequences in determining the per-acre value of each, the only concession being made as to Block 240, Lot 2, because of its inferior quality.

Publicly-owned watershed property is to be assessed pursuant to *N.J.S.A.* 54:4–3.3, which provides among other things:

> . . . the lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply, shall be subject to taxation by the respective taxing districts where situated, at the true value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation.

The purpose and intent of this method of assessment was construed in *Newark v. West Milford Tp.*, 9 *N.J.* 295, 301, 88 *A.* 2d 211, 214 (1952):

. . . to distribute the tax burden of the taxing district equally between the municipality owning watershed lands and the lands of the other taxpayers of the district. It subjects such lands to taxation at their true value on the same terms and conditions as the lands of the other taxpayers in the district are subjected to.

■ Since the lands must be assessed in the same manner and to the same extent as lands of private persons, the assessment must be made in accordance with *N.J.S.A.* 54:4–23, which provides that the true value test is what the property "would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments . . . ." True value is the value the property has in exchange for money. *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N.J.* 157, 163, 65 *A.2d* 828 (1949).

In remanding the cause to the Division of Tax Appeals, the Supreme Court, in *Newark v. West Milford Tp.*, supra, recognizing that the problems presented to the Division of Tax Appeals were not without difficulty under the applicable statute, stated:

The true value of these watershed lands can only be reasonably approximated and will have to be determined by comparison of the representative component parts of the various classifications of the lands, which in the aggregate make the total of 18,548 acres, with the true value of comparable parcels of land owned by private persons adjacent to the watershed or reasonably nearby in the township, measured by the standard of value established by a fair and bona fide sale at private contract.

Such lands need not match exactly as do the parts of a jig-saw puzzle, nor is it necessary to compare for value each and every square rod or acre in this vast tract. The value of the aggregate of these lands may be established by a comparison of a representative number of comparable parcels owned by private persons to an equally representative and comparable number of tracts or parcels in the various classifications of the lands making up the watershed, to the extent that the sum total of such values established will represent such a percentage of the total that the value of the lands of the entire watershed may be reasonably approximated therefrom. [at 308, 88 *A.2d* at 217]

Newark's expert presented a detailed appraisal containing considerable factual and statistical data concerning the developability of the subject lands and of its comparable sales properties. Much of this data was prepared in conjunction with the Newark Watershed Conservation and Development Corporation 1972 study which recommended that part of the lands be leased for private development. The relationship between the land characteristics, such as soils, slopes and hydrology, and its suita-

bility for development was testified to by Mr. T. Moore[2] in a very detailed manner. Mr. C. Minert, Deputy Director of the corporation, described the methodology of transferring available data to various exhibits from which he then analyzed the development potential of the subject and comparable sales lands. His studies indicated that approximately 10% of the subject lands was suitable for development. These studies further indicated that when developability ranged from 45% to 57%, the sales prices ranged from $2,000 to $2,500 an acre; between 20% and 44% the prices were between $1,000 and $1,300 an acre, when the developability factor was less than 20% the per-acre price was approximately $450. Because of the size of the subject premises, Newark's nine comparable sales were of tracts of 100 acres or more, all in Vernon Township. After making adjustments for size, Newark's expert determined the per-acre base price to be $1,500. He then adjusted for the differences between the developability of the various parcels by reducing the $1,500 base by approximately 20% for each 10% reduction in developable land. He concluded, as to the three major lots, that the 1973 values were as follows:

| Block/Lot | Acreage | Developability Discount | Per Acre | Value |
|-----------|---------|-------------------------|----------|-------|
| 203–1 | 1,998 | 60% | $600 | $1,198,800 |
| 210–7 | 1,588 | 60% | 600 | 952,800 |
| 240–2 | 1,506 | 75% | 375 | 565,000 |

Stating that smaller lots sell at higher prices, Newark's expert established a base price of $2,000 an acre for the 40-acre Block 240, Lot 5, to which he then applied a 75% discount factor (due to its smaller size) which resulted in a per-acre value of $500 for a total of $20,000. As previously stated, he attributed the

---

[2]Moore is the Director of the Newark Watershed Conservation and Development Corporation and has been a member of the faculty of Harvard University where he was a Loeb Fellow in Advanced Environmental Studies. He is also a member of the Advisory Commission to the United States Department of the Interior for the Gateway National Recreation Area, and a technical advisor to Rutgers University's School of Environmental Resources, Growth Management Plan.

nominal value of $100 an acre to the 292-acre reservoir lot for a total of $29,200.

In March 1973 the lands were rezoned from A–1 residential, which permitted one-family dwellings on 40,000-square-foot lots, to a conservation district zone which permitted the land to be devoted to the following uses: fish and wildlife preserve; woodland and wilderness conservation; watershed conservation; various recreational uses, such as hunting, fishing, hiking and boating; parking areas accessory to public recreation areas; one-family dwellings, but only for the accommodation of a forest ranger, fire warden or caretaker; agricultural or horticultural uses, and special exception uses relating to conservation and recreation. Prohibited in the conservation district were construction of residences or the conversion thereof, commercial recreation and commercial logging of trees or removal of tree cover except as recommended by the state forester. The minimum development area was 100 acres. As a result of this restrictive zoning, Newark's expert, while maintaining the reservoir lot at $100 an acre, then discounted the other tracts by 80%–90% and arrived at a total value of $1,338,900 for the years 1974 and 1976.

Vernon's expert determined the highest and best use of the property to be those uses for which the lands were zoned, *i. e.*, residential in 1973 and conservation (including watershed) in the subsequent years. His opinion that the market reflected no decrease in value for conservation district-zoned lands with limited development potential seemingly finds support in certain comparable sales. His sale number 8, for instance, was of 2,998 acres of unimproved land which was sold in June 1973 for approximately $2,800,000, or a per-acre price of $937. Approximately 750 acres were located in Vernon Township with the balance in West Milford. The tract was purchased by the State of New Jersey (Department of Environmental Protection) with Green Acres funds. In both municipalities the lands were zoned conservation district.

Vernon's sale number 11 involved 512 vacant acres, including a 50-acre lake in West Milford. This tract, which was zoned mostly residential with part industrial, was purchased in May 1974 through the use of Green Acre funds by the County of Passaic from the Borough of Butler for $1,550,000 or $3,026 an acre.

The third sale relied on by Vernon's expert in support of his contention that zoning is inconsequential (sale number 6) involved 48.3 acres, which included a 42.8-acre lake known as High Crest Lake. The premises were purchased in November 1972 by an association comprised of High Crest Lake landowners for $72,500 or $1,500 an acre. The 5½ acres of upland were not contiguous to the lake itself but were adjacent to other lands of the purchasers. The lands were zoned residential. No public funds were involved in this transaction, as was the case in sales number 8 and 11. Because the lands involved in these sales all varied as to developability potential, road frontage and zoning, Vernon argues that buyers of vacant land, for which they had no development plans, paid as much as purchasers of property for development purposes. I do not find these sales supportive of that argument for several reasons.

While the Vernon-West Milford tract (sale number 8)[3] was zoned conservation district, there were dramatic differences in the zoning requirements between the two municipalities. For example, whereas the only permissible development in Vernon was for a dwelling on a 100-acre lot, and then with an extremely limited occupancy, West Milford allows dwelling construction on five-acre lots for sale to the public. The West Milford conservation zone also permits such uses as utility buildings, churches, schools, playgrounds and recreation development, including golf courses. It is obvious that the West Milford zone is far less restrictive than Vernon's, a difference that would make the former lands more attractive and valuable to potential developers.

---

[3]No allocation of the sales price was made between the lands in the two municipalities.

I further note that the High Crest Lake sale (sale number 6) was to an organization comprised of property owners whose lands surrounded or were in close proximity to the lake and whose interests in its use adds a vital element to value. Also, the permitted residential use of this land cannot be overlooked in determining value.

As to the two Green Acres purchases (sales numbers 8 and 11), I note that the intent of the Green Acres program pursuant to *N.J.S.A.* 13:8A–19 is the conversion of lands which would otherwise be developed, into open space for the benefit of New Jersey's citizens. Plainly stated, the Green Acres program would prevent land from being utilized for its highest and best use. Consequently, what may be restrictive zoning to a developer was of no practical importance to the State or Passaic County. In concluding that the zoning had no impact on value, it appears that Vernon did not distinguish between the use which purchasers make of their property and its highest and best use at the time of sale. The appraisals of land that establish the purchase price are based not on a conservation use proposed by the State or the county, but on the highest and best use of the land at the time of sale.

I also find fault with Vernon's premise that, because only a small portion of the subject lands are suitable for development, their value for conservation-watershed and reservoir purposes is equalized. Thus, it argues that the change from 40,000-square-foot residential zoning to conservation district with a 100-acre minimum lot zone was of no consequence. But its conclusion that the highest and best use of the land is for conservation bears no relationship to its method of adjustment for differences between the comparables and the subject land. In explanation of the difference in value, Vernon contended that road frontage increased value. While this argument may be appropriate to lands zoned for commercial-industrial-residential use, I fail to find its applicability to lands zoned for conservation. More logical in such cases is the contrary argument because, after all, is it not the more remote-type property that is of the greatest interest to conservationists? Does not the existence of marshy

and low or high mountainous lands, which would adversely affect residential development, increase the value of conservation property?

I find Vernon's argument that the highest and best use of the property was for conservation provides no guide to its value. In fact, its argument suggests that it was, at least, equally concerned with a defense of the zone change as it was in finding true value of the land.

Where vacant land is zoned for residential or commercial or industrial use it may be successfully argued that the differences in the permitted uses have no significant effect on value. That argument cannot be made here where the critical issue deals not with the different type of permitted uses but with use and nonuse. While theoretically the ordinance does permit improvements (one-family dwellings and public recreation area parking lots), by restricting the occupancy of the dwellings to a limited few on 100-acre plots and prohibiting commercial recreational areas, the zoning ordinance very effectively accomplishes its conservation purpose. Such restrictions will obviously result in the conservation of the land. While, in the abstract, land conservation has value, it is not that monetary value which is the ultimate goal in making assessments. Therefore, while making no attempt to determine its validity nor to detract from the necessity of preserving open space for future generations, I find that Vernon's zoning ordinance adversely affected the value of the subject lands.

That the impact of such zoning should be considered in making assessments is obvious and has been recognized by both the legislature and the courts. *N.J.S.A.* 58:16A *et seq.*, after authorizing the promulgation of rules and regulations to preserve the floodwater carrying capacity of rivers and streams by restricting the uses to which certain lands could be devoted, provides that local assessors shall consider the impact of rules and regulations issued pursuant to this act in estimating value of lands designated as floodways or flood fringe areas. *N.J.S.A.* 58:16A–61.

In *Cappture Realty Corp. v. Elmwood Park Bd. of Adj.*, 126
*N.J.Super.*, 200, 217, 313 *A.2d* 624 (Law Div.1973), aff'd 133
*N.J.Super.* 216, 336 *A.2d* 30 (1975), where the municipality had
imposed a moratorium on building construction and the land-
owner claimed that it was being assessed as if its lands were not
under a moratorium, the court held:

> It appears obvious that, the moratorium establishes as a matter of law that
> the subject land is temporarily restricted, and presumably the tax assessor
> establishes true value accordingly for that period . . . The taxing authori-
> ties cannot have it both ways. It may be noted that [*NJSA* 58:16A–61] would
> require tax assessors to consider the impact of rules or regulations issued
> pursuant to that act in establishing full value of lands designated as floodways
> or flood fringe areas. The court considers this merely a restatement of present
> law. [at 217, 313 *A.2d* at 633]

The proposition that conservation zoning should be reflected
in the assessment of affected property is also supported by well
established public policy of this State. For instance, examina-
tion of various statutes reveals a policy to use property tax
assessment as a tool to further conservation and related pur-
poses. In the Farmland Assessment Act of 1964, *N.J.S.A.*
54:4–23.1 *et seq.*, land actively devoted to agricultural or horti-
cultural use is assessed for real estate tax purposes at the value
it has for agricultural rather than potential development use.
This Act has been broadly construed by our courts in *Andover
Tp. v. Kymer*, 140 *N.J.Super.*, 399, 356 *A.2d* 418 (App.Div.1976),
where the court rendered its decision consonant with its percep-
tion of the policy behind the lower assessments allowed farm-
land:

> But other objectives, although incidental to this principal purpose, are also
> significant, such as encouraging the maintenance and preservation of open space
> and the beauty of the countryside. [at 404, 356 *A.2d* at 420]

So, too, other New Jersey statutes show a legislative design to
give real estate tax relief to those properties dedicated to
conservation or open space purposes. *N.J.S.A.* 54:4–3.63 *et seq.*
concerns exemptions from real property taxation of those par-
cels owned by nonprofit corporations furthering the following
public policy:

> The Legislature hereby finds and declares that natural open space areas for
> public recreation and conservation purposes are rapidly diminishing; that public
> funds for the acquisition and maintenance of public open space should be

supplemented by private individuals and conservation organizations; and that it is therefore in the public interest to encourage the dedication of privately-owned open space to public use and enjoyment as provided for in this act.

I perceive no valid distinction where the use of land is curtailed by floodland zoning, building moratoriums, state-encouraged conservation easements or local conservation district zoning. The end result is the same, and that result must be reflected in the assessments. Indeed, the benefits received by lower taxes may be the best economic incentive to insure private participation in the conservation of open space.

■ While Newark's detailed studies would seemingly reduce the margin of error in the inexact science of real estate appraisal, a review of the record indicates that these studies are not without fault. First it is noted that Minert's findings, to a great extent, were based on aerial photographs having a scale of 1″ to every 24,000 square feet. Obviously when dealing with 5,500 acres, even a small error has a great impact. Secondly, the assumption that a relatively small degree of developability as found in the subject parcels establishes absence of value does not necessarily follow. This hypothesis overlooks the happenings in the real world of the marketplace. Out of its woodlands, mountains, rocks, marshes and swamps Vernon boasts one of the State's largest resort hotels. While the testimony indicates that the lands upon which the Playboy enterprise was constructed were generally superior to those under consideration, the fact of its existence cannot be discounted. Nor can the existence of the many lake developments, which were carved out of the countryside and some of which are in close proximity to the subject lands to be overlooked. In fact, the highly developed Barry Lakes community was constructed on lands which, according to Minert, had only a small degree of developability.

It is next to be noted that Newark's ranges of value based upon developability are far too broad to support its contentions with certainty. For example, under its theory lands with 19% developability would sell for $450 an acre while those with a 20% factor could command a sales price of $1,300. Those with a 44% developability factor could sell for $1,000 while a parcel with a

45% factor could command as much as $2,500 an acre. However, although the studies cannot be accorded that degree of reliability sought by Newark, they do demonstrate the fact that the market does take into account the varying qualities of land even in those cases involving thousands of acres.

In addition to the three sales previously referred to, Vernon's expert testified to seven other transactions which, for the most part, consisted of relatively small tracts (five were less than 84 acres and three were 19, 32 and 37-acre parcels). Two transactions, however, are particularly pertinent. Sale number 13 consisted of 113 acres in West Milford which, in March 1975, was sold for $85,000, or $751 an acre. The land was zoned conservation district which, as has already been discussed, was far more liberal than the comparable zone in Vernon. Its location in another taxing district is outweighed by the fact that it is in close proximity to the subject tract and possesses many of the same characteristics. It was described by Vernon as containing all rear land surrounded by the Pequannock Watershed. Its only access was by a trail from a paved road. The land was generally level, part wooded and part marshy.

Vernon's sale number 9 was of 118 acres which were completely surrounded by two of the subject parcels. This tract was sold in July 1973 for a recited consideration of $100,000 or $845 an acre. It, too was zoned conservation district. It was the only comparable utilized by the two experts. This tract's characteristics were very similar to those of the subject lands.

In addition to Vernon's sale number 9 (Newark's sale number 7), Newark's expert testified to several transactions, all of which were in Vernon, and some of which are most pertinent to a valuation of the subject tracts. Sale number 2 consisted of 262 acres, zoned part residential and part commercial, which were sold in June 1970 for $1,300 an acre. In addition to the zoning, the topography and location of this tract were obviously superior to the premises in question. Newark's sale number 8 was of admittedly poor lands consisting of 467 acres of mountainous land situated between two lakes. It was zoned for 10,000-

square-foot residential development and sold for $482 an acre in May 1974. The balance of Newark's sales were of lands far superior to those in question.

In summary, of the 27 alleged comparable sales referred to by both parties, I find that the four transactions discussed above are most comparable. While all transactions have been considered, serious consideration of the balance has been rejected because those lands were so incomparable to the subject property in terms of topography, location and size that they would lend little to the quest for value. However, while the final four sales are pertinent to the question of value, all sales are clear evidence of the fact that all land, whether consisting of mountains and lakes, low and high, dry, wet, swampy and marshy land, has value and is bought and sold in the marketplace.

A consideration of the four pertinent sales discloses a per acre value of $482 for that of the poorest quality land (Newark sale number 8) [4] to a high of $1,300 an acre (Newark sale number 2). A determination of value within that range must necessarily focus on that sale of land which was used by both parties and which, more than all other sales, reflects the characteristics of the subject land in terms of topography, location and zoning. While this parcel is substantially smaller than the Newark parcels, its 118 acres are considered to be of sufficient size to reflect the market price of the subject tracts. Vernon's expert attempted to minimize the importance of this sale by claiming that it was not an arm's-length transaction. Inconsistent with the argument, however, is the fact that Vernon did use this sale in its study. Confronted with the argument, the witness claimed that it was utilized only to demonstrate the lower range of the value scale. I find the sale to be not only useable but very pertinent to a determination of the value of the subject land both prior and subsequent to the zone change.

The unrefuted testimony of the purchaser's son (a New Jersey attorney) who participated in that part of the negotiations

---

4Newark's studies showed this tract to have a zero developability factor.

which are here pertinent disclosed the following. While the land was included in the March 1973 conservation district rezoning, it was sold on the basis of the seller's representation that it was in the residential zone. In July 1973 the sale was consummated. The seller accepted $20,000 in cash and took back an $80,000 mortgage. Upon being apprised of the conservation district zoning and after various meetings, the transaction was renegotiated. The purchase price was reduced to $50,000 by decreasing the mortgage amount to $30,000. The per acre price of $845 for residential land was thus reduced to $422.50 for conservation district land. His testimony also indicated that the transaction was bona fide and concluded only after some protracted and good faith negotiations.

The value indicated by the above sale falls approximately at the midway point between the high of $1,300 an acre for superior land and the low of $452 for inferior land established by the other pertinent transactions. The value of $845 an acre finds credible support in the March 1975 sale (Vernon sale number 13) at $751 an acre of inferior land. These factors convincingly demonstrate that, with the exception of Block 240, Lot 2, the subject lands had a 1973 value of $845 an acre. As to inferior Block 240, Lot 2, I find it to have a per-acre value of $507, or 60% of the value of the other land.

 Turning to the zoning issue, I initially note that the taxing district, as was pointed out in *Cappture Realty v. Elmwood Park of App., supra,* cannot have it both ways. As a practical matter, following the March 1973 rezoning a purchaser could, at best, attempt to improve this vast acreage with some 500 dwellings. The financial realities of the marketplace dictate that such a venture is, at the very best, most remote. As such, the taxing district cannot expect a tax return from conservation district-zoned lands equal to that from lands whose zoning would allow substantial residential development. In this circumstance Newark adopted the principle of its sale number 7 (Vernon's number 9). The values thereby adopted are 50% less than the value for the preconservation district-zoning of the

1973 tax year. Absent any credible proofs by Vernon on this issue, I find the true value of the lands in 1974 and 1976 to be $422.50 an acre. Block 240, Lot 2, is valued at $253.50 an acre, or 60% of the value of the other lots.

In support of its claim of discrimination Newark's expert claimed that there was no common level of assessment in Vernon in 1974 and 1976. He based this conclusion on an analysis of the Director of Taxation's one year study of sale, which, in the opinion of the witness, were "all over the spectrum" when viewed as a percentage of assessment and the Director's study of the coefficient of deviation which was in excess of 20%. In short, Newark's proofs consisted of a compilation of statistics assembled by the Director which are annually issued to promulgate the ratio of assessed value to selling price throughout the State's taxing districts. Standing alone, these proofs are wholly inadequate to establish discrimination in terms of the decisional law developed in recent years in New Jersey. First and foremost, Newark failed to establish that, relative to the generality of other assessed real property in Vernon, its property was being assessed on a less favorable basis. This, among several other recent judicial prerequisites, must be established to accommodate the holding of the Supreme Court in *Tri-Terminal Corp. v. Edgewater*, 86 *N.J.* 405, 346 *A.2d* 396 (1975). Here, there is no indication that the value of Newark's land did not rise during the years in question to the general extent and in the same proportion as that of all other taxpayers. In that regard it is to be noted that the impact of the zoning on the value of the lands has already been taken into consideration. Moreover, there is the more important circumstance that Vernon completed a revaluation effective for the year 1973, the first year under appeal. Significantly, Newark made no claim for discrimination relief in that year. The close proximity of the latter two years to the revaluation year may, in itself, be sufficient to negate discrimination. To like effect, is the more recent decision of the Supreme Court in *Piscataway Associates v. Piscataway*, 139 *N.J.Super.* 276, 353 *A.2d* 542 (1976). Accord-

ingly, I find that Newark's proofs fell short of satisfying the criteria necessary to establish discrimination.

I find the value of the subject lands to be as follows:

### 1973

| Block/lot | Acreage | Value Per Acre | Value Per Lot |
|-----------|---------|----------------|---------------|
| 203–1 | 1,998 | $845 | $1,688,310 |
| 203–1A | 292 | 845 | 246,740 |
| 210–7 | 1,588 | 845 | 1,341,860 |
| 240–2 | 1,506 | 507 | 763,542 |
| 240–5 | 40 | 845 | 33,800 |
| | | | $4,074,252 |

### 1974 and 1976

| Block/lot | Acreage | Value Per Acre | Value Per Lot |
|-----------|---------|----------------|---------------|
| 203–1 | 1,998 | $422.50 | $ 844,155 |
| 203–1A | 292 | 422.50 | 123,370 |
| 210–7 | 1,588 | 422.50 | 670,930 |
| 240–2 | 1,506 | 253.50 | 381,771 |
| 240–5 | 40 | 422.50 | 16,900 |
| | | | $2,037,126 |

Judgment shall be entered accordingly.