RIMM, J.T.C.
These local property tax matters involve valuation and discrimination for the tax year 1980. The primary issue in each case is the effect of Executive Order 71 issued by Governor Brendan T. Byrne on February 8, 1979, providing for the establishment of the Pinelands Planning Commission and making development in the Pinelands generally subject to Commission approval, and the effect of the adoption of the Pinelands Protection Act, N.J.S.A. 13:18A-1 et seq., L. 1979, c. Ill, § 1 et seq., effective June 28, 1979, on the value of plaintiffs’ land. The effect has to be measured as of October 1, 1979, the critical assessing date for the tax year in question.
All of the properties involved were vacant land and the assessments in each case were as follows:
Plaintiff Docket No. Number of Lots Assessment
Scudamore 01-23133A-80 2 $ 4,000
Scudamore 01-23134A4-80 16 33,200
01-23135A2-80 9 Ratori 18,400
01-23136A3-80 9 Ratori 15,800
01-23137A13-80 96 Ratori 202,600
01-23138A10-80 90 Saiano 167,200
01-23139A16-80 108 Vitsano 235,100
01-23140A2-80 6 Riorano 65,500
01-23141A-80 1 Helios 2,400
Total 337 $ 744,200.
*553 On appeal by the taxpayers to the Atlantic County Board of Taxation, the assessments were sustained. The matters are now before the Tax Court on the taxpayers’ complaints seeking reductions in the county board judgments.
The 337 lots constitute two tracts totaling 1,861[1] acres and comprise approximately 25% of the undeveloped land area of the taxing district. One tract consists of 1,661 acres in the northeastern part of the township. The other 200 acre tract is in the northwestern part of the township and is about 800 feet from the larger tract. The lands consist primarily of five-acre lots into which virtually all of the undeveloped area of the township has been divided. Lots owned by other parties and not the subject of this litigation are scattered through the larger tract.
Although ownership of the lots is divided among the plaintiff corporations, planning and developing control over the land is in Omnia Properties, a New York City real property management firm. The entire area is regarded as a single unit for planning and development purposes. At the request of all parties the matters were consolidated and the tracts were treated as a single unit for valuation purposes. Evidence at the trial was presented by the parties on the theory that every acre of land in both tracts had the same value for local property tax purposes as every other acre. The court accepts that theory in this case, and the court’s determinations will be based on the evidence so presented.
In accordance with the plaintiffs’ appraisal, marked in evidence, the property was acquired by the six plaintiff corporations as follows:
1. 1,748 acres were acquired by Riorano, Saiano, Yitsano and Ratori on April 29, 1975 for $1,000,048.
2. 4.95 acres were acquired by Helios Realty Corporation on March 15, 1979 for $5,000.
*554 3. 9.5 acres were acquired by Scudamore Realty Corp. on April 14, 1979 for $9,500.
4. 77.00 acres were acquired by Scudamore Realty Corp. on July 2, 1979 for $96,000.[2]
Plaintiff in each ease alleged in its complaint that the assessments and the county board judgments were in excess of the true value of the property and that the assessments were discriminatory “in comparison with other assessments in the taxing district.” Each plaintiff also claimed “its full rights under” the provisions of N.J.S.A. 54:2-40.4 et seq., L. 1973, e. 123, commonly known as chapter 123.
The court’s determinations in these cases are circumscribed by Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d (App.Div.1973), in which the Appellate Division said:
In order to make out a case of actionable discrimination, these elements must be proved: (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was, and (3) the true value of the subject property upon which the common level percentage would operate, [at 450, 300 A.2d 850]
The proofs required by points (1) and (2) are obviated by chapter 123. Devonshire Development Ass’n v. Hackensack, 2 N.J.Tax 392, 399, 184 N.J.Super. 371, 446 A.2d 201 (Tax Ct. 1981). Proof of value, however,'remains an elemental part of plaintiffs’ cases. In providing such proof,
. . . ‘[s]everal procedures for the valuation of land are available to the appraiser.’ The Appraisal of Real Estate, Amer. Inst, of Real Estate Appraisers (7th ed. 1978) 140. They are the market data (comparative) procedure; the allocation (abstraction) procedure; the anticipated use (development) procedure; and the land residual procedure. [Brick Assoc. v. Brick Tp., 4 N.J.Tax 510, 514 (Tax Ct. 1982)]
Two witnesses testified on behalf of plaintiffs. One was an expert in the field of real estate planning and development. Within that general field his “specialization has been in land use controls, zoning, subdivision, site plan and aspects of development, both physical and fiscal.” The witness referred to the *555 land as the Omnia properties and regarded the land as one parcel for planning purposes even though it consists of many lots and blocks.
The witness calculated the value of the land according to housing costs and the ability to pay of prospective purchasers. He testified that at the behest of Omnia he made an economic study of the development of the property. The study resulted in land values based on housing costs. His conclusions were based on the character of the land, surrounding development and the property’s location and access. The study showed that the housing to be built on the subject land had to be modestly-priced dwelling units of a variety of kinds “designed to meet the growing and emerging market of the employees flocking to Atlantic City who would be employed at the lower economic levels” of the casino industry. The witness therefore assumed that all the housing units to be built on Omnia’s land would be small in size. For purposes of valuing the land he selected two relatively small-sized, single-family units as the basis of the development of the land. One size was a two-bedroom unit of 1,200 square feet and one was a three-bedroom unit of 1,400 square feet. Using a building cost service indicating construction costs adjusted for area and time, he determined that the cost of construction would be approximately $36 a square foot. To the cost of construction the witness added a land cost of 12.5% of the cost of construction. The witness then determined a total cost for each house by allowing 10% for “soft costs” and 15% for profit, concluding that the smaller house would sell for $59,400, including an allowance for the cost of land of $5,400, and the larger house would sell for $69,200,[3] including an allow *556 anee for the cost of land of $6,300. The witness then averaged the two costs and said that the average cost of a modestly-priced, single-family residence “under pinelands in Weymouth in 1980 was $63,300.” [4] Using his allocation of 12.5% construction costs for land, the witness said the average land value per dwelling was $5,650.[5]
The witness described his testimony on the value of the land based on construction costs as indicative of value from the supply side. He tested this value from the “demand side.” In testing the value the witness made certain assumptions. He assumed that the purchasers would be new people in the area— people who had come in response to Atlantic City employment opportunities; that the median income for individuals working in Atlantic City in 1980 was $17,000, and that both spouses would be working. Based on a total anticipated income of $34,000 he allocated $10,200 a year for shelter costs, or 30% of the total income. From the total amount available for shelter he deducted $3,050 in annual expenditures for utilities, insui • anee, real estate taxes, maintenance and related items, leaving $7,350 available for debt service.[6] He then assumed that 13.5% mortgage financing with a 25-year term, renegotiated every five years, was available in 1980. The constant for such a mortgage “would be about 15%,”[7] and he concluded that a mortgage loan of $49,000 would be available to his buyers. He then “arbitrarily” said that a down-payment of $20,000 would be required for a total cost of housing of $69,000, his conclusion of the amount which “a new family gaining entrance into the lower economic *557 rung of the gambling industry would have afforded in Atlantic County in 1980.” The demand-side analysis apparently indicated to the witness that prospective purchasers could afford his larger house, because, having concluded this analysis, the witness used a land value of $6,300 a dwelling to determine the value of the entire tract of land.
The witness then said that 94 lots would be available for development on the Omnia tract under the Pinelands Protection Act and the Comprehensive Management Plan adopted in accordance with the act. The Omnia lands are located in the forest area of the Pinelands, and the witness explained that the permissible density under the plan in the forest area is one residence for every 15 acres of land. In addition to the density limitations the plan allocates only a total of 376 [8] residences to the entire taxing district, according to the witness. Since the Omnia land constituted 25% of the undeveloped land of the township, the witness assumed that 25% of the residences, or 94 residences, would be allocated to the land. The indicated value of the property, in the witness’ opinion, was 94 X $6,300, or $592,200.
The second witness called by the taxpayers was an appraiser, who valued the land as of October 1, 1979. His value was arrived at in a two-step process. First he took the four purchases by which the tract was obtained and adjusted each sale for time only, as follows:
*558 Year of Sale Time Adjustment Indicated Value
1975 20% $ 1,200,000[9]
1979 None 9,500
1979 None 96,000
1979 None 5,000
Total indicated value $ 1,310,500
The witness then reduced the indicated value by 50% for “pine-lands zoning.” He felt that “a minimum of 50% adjustment is warranted when weight is given to current zoning.” Therefore the value of the subject property as of October 1, 1979 was $655,250.
During the course of direct examination the witness testified that the Pinelands restrictions had a serious impact on the valuation and utilization of the property. “They have an impact on the utilization which affects the value.” The witness was asked how greatly the restrictions diminished the value of the property. He responded as follows:
I have to estimate a minimum of 50%. Now, it’s difficult to tell the total impact, because at the present period of time we do not have enough sales data. In fact we have very little sales data, if any, that reflects valuation of large tracts of land being effected by the Pinelands Preservation Act.
On cross-examination the witness testified that he visited the area twice; that he spent an hour or two in the area on each visit; that he did not speak to any builders in the area; that he did not look at the records of the building inspector of the municipality; that he did not consult any realtors about local sales or listings; that he did not go to the county clerk’s office to see what deeds had been recorded or what property had been transferred in the municipality, although he did look at deeds and sales reports (SRIAs) at the county board of taxation; that, although he had testified about average square footage of houses built in the municipality in 1979 or 1980, he did not have any knowledge of such average square footage; that he did not know what the average sale price of residences in the municipality was, and that his research indicated that there were few *559 sales of vacant land in the Pinelands area for 1978, 1979 and 1980.
When asked by the court how he arrived at the 50% adjustment, the witness said, “It’s an opinion by me based on my experience in the real estate business.” Such an opinion is no better than that of the expert’s rejected opinion in Inmar Assoc., Inc. v. Edison Tp., 2 N.J.Tax 59 (Tax Ct.1980). In Inmar Assoc., Inc. the court said:
I note that the 60% downward adjustment to the value of the comparable property is without any support in the record other than its basis in the knowledge and experience of the expert. The weight to be given to an expert’s testimony relative to such adjustments depends upon the facts and reasoning which form the basis of the opinion. An expert’s conclusion can rise no higher than the data providing the foundation. Passaic v. Gera Mills, 55 N.J.Super. 73 [150 A.2d 67] (App.Div.1959), certif. den. 30 N.J. 153 [152 A.2d 171] (1959). If the basis for the adjustments are not made evident, the court cannot extrapolate value. [2 N-J.Tax at 66]
The taxing district also called two witnesses. One was the executive director of the Pinelands Commission who had been employed in that position since June 28, 1979. He testified that regulation of the Pinelands commenced in New Jersey by virtue of Executive Order 71 signed by the Governor on February 8, 1979. The order was pursuant to the National Parks and Recreation Act of 1978, in accordance with which the Federal Government established the Pinelands National Reserve in December 1978. Senate Energy and Environment Committee Statement, Senate, No. 3091 -L. 1979, c. 111. See N.J.S.A. 13:18A-1. The executive order created the Pinelands Planning Commission called for in the federal act and established a review procedure to be followed until completion of a formal plan for review. The next step in Pinelands regulation was the enactment of the Pinelands Protection Act, effective June 28, 1979, establishing the Pinelands Commission. N.J.S.A. 13:18A 4. As a result of the adoption of the act, the Pinelands Commission commenced administering the review procedure which had been administered since February 8, 1979 by the Pinelands Planning Commission.
The act charged the Commission with the preparation and adoption of a comprehensive management plan for the Pine- *560 lands area. N.J.S.A. 13:18A-8. On July 27, 1979, pending the adoption of the Comprehensive Management Plan, the commission adopted “Interim Rules and Regulations for Review and Approval of Applications for Development or Construction Under the Pinelands Protection Act.” N.J.A.C. 7:1G-1.1 et seq. Twelve standards, N.J.A.C. 7:1G-I.ll(a), were adopted by the Commission and were applied when any application for development was submitted to the Commission between July 27, 1979[10] and January 14, 1981, the effective date of the Comprehensive Management Plan. Between February 8,1979 and July 27,1979 the review function involved essentially similar standards. The entire period of time between February 8, 1979, the date of the Governor’s executive order, and January 14, 1981, the date of the plan, is referred to as the interim or moratorium period of Pinelands regulation.
The Pinelands National Reserve created by the federal act contains approximately 1,100,000 acres. The Pinelands Protection Act created the Pinelands Area, an area somewhat smaller than the reserve. Under state law the area was divided into two parts: the preservation area, the more severely restricted of the two areas and commonly called the core area, and the protection area. The plan then established “eight management areas governing the general distribution of land uses and intensities” in both statutory areas: preservation area district; forest areas; agricultural production areas; special agricultural production areas; rural development areas; Pinelands villages and Pinelands towns; regional growth areas and military and federal installation areas.* [11] The witness also testified that several procedures were available to a land owner for determining a method for developing his land: application for a letter of interpretation, application for waiver of specific standards in the plan, or a “straight” application for development. None of *561 these procedures were ever used by Omnia, although there were two meetings between representatives of Omnia and members of the Commission staff. Omnia considered the meetings preapplication conferences. The executive director said they were for the purpose of Omnia’s making recommendations for provisions in the Comprehensive Management Plan.
The Pinelands Protection Act also provided that within one year of the adoption of the Comprehensive Management Plan counties and municipalities must revise their master plans and zoning ordinances to comply with the Comprehensive Management Plan. N.J.S.A. 13:18A-12(a) and (b). The one-year period was designated “time of conformance.” The director said that the plan provides that, under certain circumstances, a municipality may propose that additional residences be allocated to it. For example, in order to carry out a housing program in one part of a municipality, additional units may be allocated if the allocation and concentration in one area would have the effect of avoiding development over a larger area.
The assessor also testified on behalf of the taxing district. She testified about 50 sales of vacant land that had occurred between January 9, 1979 and May 19, 1981. Based on the 50 sales, it was the assessor’s opinion that the Omnia lands had a value of $1,200 an acre, or $2,233,300, as of October 1, 1979.
The sales involved tracts of land varying in size from 1.42 acres to 259.40 acres, and the prices varied from $700 to $6,000 an acre. Twenty-nine of the sales were in Weymouth Township. The other 21 sales were in the three contiguous municipalities of Hamilton Township, Buena Vista Township and the City of Estell Manor. In the area of the Omnia lands the municipal boundary lines of Weymouth Township involve an unusual configuration, and the lands in the comparable sales in all three contiguous municipalities were either actually contiguous to the subject property or to the Weymouth Township boundaries in close proximity to the subject property.
In arriving at value the assessor relied primarily on sales in Weymouth Township which were in the general area of the *562 Omnia holdings. The most comparable sales were the three recent sales to two of the plaintiffs as follows:
Price
Date Purchaser Block Lots Price Acres Per Acre
3-15-79 Helios 78 2 $ 5,000 4.95 $ 1,010
3-27-79 Scudamore 43 6,12 9,500 8.60 $ 1,104[11]
6-28-79 Scudamore 53 1, 2, 3, 5-8
58 1-7,11,12 96,000 77.64 1,236[12]
Of the remaining 26 sales in Weymouth Township, 19 involved sales of five-acre tracts, with prices ranging from $1,000 to $3,200 an acre. The other seven Weymouth Township sales were as follows:
Price
Date Purchaser Block Lots Price Acres Per Acre
1- 9 79 Montemarano 84 1 part of
86 1 larger tract 259.40 $ 3,627
2- 1-79 Hardt 85 1,2,3 $ 798,000 142.5 5,600
3- 1-79 Johnson 3 7 6,000 6 1,000
7-14-79 Varvaro 9 13, 14 13,300 10 1,330
3- 1-80 Melhem 36 17-21 30,000 25 1,200
4- 22-80 Weymouth Park 84 1 part of
Investors 86 1 larger tract 259.40 6,000
9-2-80 Kaskus 14 10A 7,500 2.5 3,000
Although instructive as indicating the nature of the market, the weight to be given to the January 9,1979 and April 22,1980 sales in determining value must be limited. The first of these. two sales involved an 1,100-acre tract of land adjoining the Omnia property in the northeastern part of the township. The tract involved 259.40 acres in the township, 68 acres in Estell *563 Manor and the balance in Hamilton Township. The per acre price was calculated by the assessor on the basis of the total price of $3,989,730 for the entire 1,100 acres, but the assessor did not testify that there was uniformity of value among the acres in the tract. The April 22, 1980 sale was a resale of the same tract for a total price of $6,600,109. The assessor’s per acre price for the Weymouth Township portion of the tract was calculated the same way as in the first sale. In addition, some of the land in the tract in Hamilton Township was in a less restrictive management area.
The February 1, 1979 sale also has limited utility in determining value because, although occurring after the establishment of the Pinelands National Reserve in December 1978, it did predate the executive order of February 8, 1979 and involved a tract of land for which a zoning variance had been granted by the municipality. It is important to note that application for development of this tract was denied during the moratorium and then granted for 600 mobile home units on the basis of a hardship after the adoption of the Comprehensive Management Plan.
The Johnson, Yarvaro and Melhem sales all indicate values similar to the three sales to two of the plaintiffs. The Kaskus sale involves an even smaller tract and, in any event, there is nothing in the record to indicate what reliance was placed on that sale by the assessor.
Both experts relied on the three recent sales of portions of the subject property, namely block 78, lot 2; block 43, lots 6 and 12, and block 53, lots 1, 2, 3, 5-8 and block 58, lots 1-7, 11, 12, in giving their opinions of value. Comparing the three sales with the entire property which is the subject of this litigation involves comparing per acre values of tracts with widely disparate sizes. In addition, the appraiser pointed out that the three sales were impacted by an “expansion or assemblage factor” because they involved purchases of property added to a tract already owned by the same interests. The experts made no specific *564 adjustments for assemblage cost[13] nor for size. The problems relating to size and assemblage cost are overcome by using the sales of the entire subject property as was done by the appraiser. This, then, involves a comparable sale of 1,748 acres adjusted for time. The witness’ explanation of the time adjustment for the sale was realistic.
The court accepts the value of the subject property determined by plaintiffs’ appraiser after considering the sales of the subject property with only an adjustment for time.
... [T]he trial judge as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt “so much of it as appears sound, reject ali of it, or adopt all of it.” State Highway Com. v. Dover, 109 N.J.L. 303, 307 [162 A. 749] (E. & A. 1932). [Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174 [394 A.2d 390] (App.Div.1978), certif. den. 79 N.J. 483 [401 A.2d 239] (1979)]
The court finds that the value of the subject land as of October 1, 1979 was $1,310,500.
The court acknowledges that true value cannot always be found based on the sale price of the subject property. However, the price may be dispositive under certain circumstances. Halo-carbon Products v. South River, 1 N.J.Tax 294, 302 (Tax Ct. 1980), aff’d 181 N.J.Super. 1, 436 A.2d 532 (App.Div.1981). Where, as here, both experts agree on the comparability of three sales and plaintiffs’ expert used only sales of the subject as the basis of his opinion of value, the court is persuaded that the sales of the subject may be used as the basis for finding true value. The true value of $704 per acre is very close to the $700 per acre value at the lower end of the range of values indicated by the assessor’s 50 sales.
An interesting aspect of the three recent comparable sales of the subject property is that each purchase was made by plaintiffs on the recommendation of the witness who testified as *565 their planning expert. Yet each purchase was made after the February 8, 1979 order establishing the initial review procedure which the witness said adversely impacted the development of the land.
In using the market data approach to value in this case, the court concludes that plaintiffs’ planner did not adequately support the per unit land values in his development approach, which is acceptable only if properly supported. Genola Venture-Shrewsbury v. Shrewsbury, 2 N.J.Tax 541 (Tax Ct.1981).
Although the witness referred to studies, the court was not made aware of them. Based on the record before the court, the size of houses to be sold in Weymouth Township, the income of prospective purchasers and the mortgage financing available were only speculation on the part of the witness. Particularly unreliable was the arbitrary allocation of one-fourth of the township’s units to Omnia because it owns one-fourth of the undeveloped land. How much of the other undeveloped land is even susceptible of development? How many other developers own sufficient land in the township on the basis of which they will seek allocation of a portion of the units to them? How interested will the township be in having ratables so that a larger allocation may be made to Omnia if it is prepared to develop its land? Further, a careful analysis of the Comprehensive Management Plan does not support the planner’s conclusion that only 94 units could be built on Omnia’s 1,861 acres. No consideration was given to how much of Omnia’s land will be encompassed in the Dorothy Village area;[14] or to other uses to which the land may be put without reducing the number of dwelling units that may be permitted; or to the fact that the township may, under certain conditions obtain more than 376 dwelling units; or what impact 600 mobile home units will have on the overall housing market in Weymouth Township, possibly resulting in a larger allocation to the Omnia lands; or to the *566 fact that the grandfather provisions in the act[15] may reduce demand by others for a portion of the 376 units. Finally, the planner’s testimony was based on the allocation to the township in the plan after January 14, 1981, some 15 V2 months after the critical assessing date in this matter of October 1, 1979.
The court realizes that restricting land uses generally has an adverse impact on the value of land. Such adverse impact on the value of land must be reflected in the assessments for local property tax purposes, as extensively discussed in Newark v. Vernon Tp., 1 N.J.Tax 90 (Tax Ct.1980), aff’d 179 N.J.Super. 332, 432 A.2d 106 (App.Div.1981). However, the court in the Vernon Tp. case, haying discussed the impact of restrictive zoning on value, and hence on assessments, concluded the matter by finding value on the basis of a review of alleged comparable sales.
To the same effect is Halocarbon Products v. South River, supra, in which the court dealt with the Flood Hazard Area Control Act, N.J.S.A. 58:16A-50. In determining the impact of that restrictive land use act on value the court concluded that the market data approach was the correct approach for determining value and based its findings on the sale of the subject property as the best comparable sale.
Cappture Realty Corp. v. Elmwood Pk. Bd. of Adj., 126 NJ.Super. 200, 313 A.2d 624 (Law Div. 1973), aff’d 133 N.J.Super. 216, 336 A.2d 30 (App.Div.1975), does not require a different result. There the court said:
Plaintiff also argues it is being assessed for taxes as if the land were not under a moratorium, and is paying property taxes under protest.... It may be noted that L. 1972, c. 185, § 10 (N.J.S. 58:16A-61) would require tax assessors to consider the impact of rules or regulations issued pursuant to that act in establishing full value of lands designated as floodways or as flood fringe areas. The court considers this merely a restatement of present law. Thus, in establishing true value of plaintiff’s property, if the tax assessor fails to take the moratorium ordinances into account, plaintiff may have been damaged by any such excess assessment, [at 217, 336 A.2d 30]
*567 The court then concluded its observation by saying that “[plaintiff has an avenue for redress through tax appeals, which should be sufficient.” On such tax appeals the taxpayer has to prove value in accordance with the law of New Jersey and acceptable appraising practices.
The value found by the court precludes either valuation relief or relief by way of discrimination to plaintiffs in this matter. The common level range for Weymouth Township under chapter 123 for 1980 was:
Average Ratio Lower Limit Upper Limit[16]
64% 54% 74%
The ratio of assessed value to true value in this matter is 56.79%,[17] which falls within the common level range.
It may very well be that the impact of the Pinelands regulations will be evidenced in the market by reduced prices for land in the Pinelands regulated areas, but that impact, as of October 1,1979, has not been demonstrated by a fair preponderance of the evidence.
Land values in Weymouth Township as of October 1, 1979 had not collapsed by 50% as indicated by the plaintiffs’ appraiser; or, if they had collapsed, the record does not substantiate that fact by a fair preponderance of the evidence. The law of the State of New Jersey and the art of appraising do not permit this court to reduce the assessments in these cases, and the court is constrained to sustain the county board judgments. Filcrest Realty, Inc. v. Edison Tp., 2 N.J.Tax 77 (Tax Ct.1980). There is *568 no implication, however, that the court will hesitate to reduce assessments in the Pinelands areas upon the presentation of relevant, competent and material evidence establishing a taxpayer’s right to such reduction. See, also, Willingboro Tp. v. Burlington Cty. Bd. of Tax., 62 N.J. 203, 300 A.2d 129 (1973); Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 46 (1981).
The Clerk of the Tax Court will enter judgments fixing the assessments for all the lands which are the subject of this litigation, in the same amounts as the county board judgments.

The assessment records of the township indicate a total area of 1,861.88 acres in the subject property.

The acres total 1,839.45 acres. See n. 1. However, the appraiser accepted the acreage computed by the taxing district as correct.

Using the witness’ method, the sale price would be $69,300 as follows:
1,400 sq. ft. at $36 a sq. ft. $ 50,400
12.5% for land 6,300
10% for “soft costs” 5,040
15% for profit 7,560
Total $ 69,300.

The average of $59,400 and $69,300 is $64,350.

The cost of construction of the 1,200 sq. ft. house is $5,400 (12.5% of $43,200). The average of $5,400 and $6,300 is $5,850.

$10,200-$3,050 = $7,150.

The constant is .1398774. Mason, Financial Tables 418 (Amer. Inst, of Real Estate Appraisers, 1981).

State of New Jersey, Pinelands Commission, New Jersey Pinelands Comprehensive Management Plan, § 5-303A.2.[jj] (1980), “Minimum Standards Governing The Distribution And Intensity Of Development And Land Use In Forest Areas.” Part II of the plan has been codified. N.J.A.C. 7:50-1.1 et seq.

Rounded. The actual figure is $1,200,058.

The Administrative Code indicates that the regulations became effective August 20, 1979.

 N.J.A.C. 7:50-5.11 et seq.

This is the sale referred to in plaintiffs’ appraisal as having occurred on April 14, 1979.

This is the sale referred to in plaintiffs’ appraisal as having occurred on July 2, 1979.

“Assemblage Cost — That excess cost of acquiring individual adjacent parcels of real estate into a single ownership beyond the estimated cost of similar sites not contiguous and not forming the specifically desired assemblage.” Amer. Inst, of Real Estate Appraisers, Real Estate Appraisal Terminology 16 (1975).

state of New Jersey, Pinelands Commission, New Jersey Pinelands Comprehensive Management Plan, Table 7.3. Part of the Omnia land may be within the contemplated boundaries of Dorothy Village.

 N.J.S.A. 13:18A — 14g.

Division of Taxation, New Jersey Dept. of Taxation, Average Ratios and Common Level Range for Use in the Tax Year 1980 (1981).

 $ 744,200 - $1,310,500 56.79%